Velvel (Devin) Freedman (*pro hac vice forthcoming*)
Edward Normand (*pro hac vice*)
Joseph Delich (*pro hac vice*)
Alex Potter (*pro hac vice*)
Ivy T. Ngo (SBN 249860)
**FREEDMAN NORMAND FRIEDLAND LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
Tel.: (646) 350-0527
vel@rochefreedman.com
tnormand@rochefreedman.com
jdelich@rochefreedman.com
apotter@rochefreedman.com
ingo@rochefreedman.com

*Counsel for Lead Plaintiff Michiel Nuveen and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re BAM Trading Services Inc. Securities Litigation | No. 3:22-cv-03461-JSC<br><br>**JURY DEMANDED**<br><br>**AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

INTRODUCTION ........................................................................................................ 1

PARTIES .................................................................................................................... 5

JURISDICTION AND VENUE .................................................................................... 5

FACTUAL ALLEGATIONS ........................................................................................ 6

I.    BACKGROUND ON CRYPTO-ASSETS, CRYPTO-ASSET EXCHANGES AND BINANCE U.S. ......... 6

    A.   The Blockchain And Crypto-Assets Generally ............................................... 6

    B.   Stablecoins .......................................................................................................... 7

    C.   Algorithmic Stablecoins ................................................................................... 8

    D.   Crypto-Exchanges And Binance U.S. ............................................................. 9

II.   THE TERRA (LUNA / UST) ECOSYSTEM ..................................................... 11

    A.   The Creation Of The Terra Ecosystem ....................................................... 11

    B.   The Interrelationship Of UST/LUNA As Part Of An Economic Scheme........................... 13

    C.   The Anchor Protocol Created By TFL Formed An Essential Part Of The UST/LUNA Economic Scheme ......... 15

    D.   Despite Claiming That The Algorithm Underlying UST Was Sound, TFL Establishes Non-Luna Reserves To Protect The UST Peg .......... 16

    E.   UST Collapses, Wiping Out Billions Of Dollars In Investments ................... 17

III.  THE SEC HAS REPEATEDLY INSTRUCTED THAT CRYPTO-ASSETS LIKE UST AND LUNA ARE SECURITIES .......... 22

IV.  UST IS AN UNREGISTERED SECURITY ....................................................... 23

    A.   UST Is An Investment Contract ................................................................... 23

        1.   UST Purchasers Made An Investment Of Money ................................ 24

        2.   UST Purchasers Invested In A Common Enterprise ........................... 24

        3.   UST Purchasers Had A Reasonable Expectation Of Profits ................. 26

        4.   UST Purchasers Expected Profits In Reliance On The Efforts Of Others ........ 28

    B.   UST Is Also An Unregistered Security Because It Is A Derivative Of LUNA, Another Unregistered Security ........... 36

        1.   LUNA Purchasers Made An Investment Of Money ............................ 37

        2.   LUNA Purchasers Invested In A Common Enterprise........................ 37

        3.   LUNA Purchasers Had A Reasonable Expectation Of Profits.............. 37

        4.   LUNA Purchasers Expected Profits In Reliance On The Efforts Of Others.......... 40

V.   BINANCE U.S. ILLEGALLY LISTED AND SOLD UST EVEN THOUGH IT IS NOT REGISTERED, IN VIOLATION OF THE SECURITIES LAWS ....................42

VI.  BINANCE U.S. ILLEGALLY LISTED AND SOLD THE UST SECURITY EVEN THOUGH IT IS NOT REGISTERED AS AN EXCHANGE IN VIOLATION OF THE SECURITIES LAWS ..............42

VII. BINANCE U.S. LISTED AND SOLD THE UST SECURITY EVEN THOUGH IT IS NOT REGISTERED AS A BROKER-DEALER IN VIOLATION OF THE SECURITIES LAWS ...............43

VIII. BINANCE U.S.'S ARBITRATION SCHEME IS PUNITIVELY DESIGNED TO DISCOURAGE RETAIL INVESTORS WITH LIMITED RESOURCES FROM FILING CLAIMS—IT IS UNCONSCIONABLE AND UNENFORCEABLE ....................43

CLASS ALLEGATIONS ....................52

CAUSES OF ACTION ....................54

PRAYER FOR RELIEF ....................71

DEMAND FOR JURY TRIAL ....................72

Lead Plaintiff Michiel Nuveen ("Plaintiff" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against BAM Trading Services Inc. ("Binance U.S.") and its CEO Brian Shroder ("Shroder," and, together with Binance U.S., "Defendants"), based on personal knowledge, the investigation of counsel, and information and belief.

## INTRODUCTION

1.      Launched in September 2019 and headquartered in California, Binance U.S. is a crypto-asset exchange that operates a platform on which customers discover, research, buy, and sell digital assets.  As trumpeted on its website, Binance U.S.'s business model is premised on selling crypto-assets throughout the United States:

> *The new economy has arrived.  We believe America should lead in crypto and we're committed to helping people across the U.S. access the world of digital assets.*[1]

2.      Unfortunately for many of these "people across the U.S.," Binance U.S.'s commitment did not include a commitment to abide by U.S. federal and state securities laws. Between April 13, 2022 and June 19, 2022 (inclusive) (the "Class Period"), Binance U.S. used its website to buy from and sell Terra USD ("UST") to investors.  Indeed, Binance U.S. stopped selling UST not when its value crashed, wreaking havoc on Binance U.S.'s customers, but rather within a week of the filing of this action on June 13, 2022.

3.      UST is an "algorithmic stablecoin" created and centrally controlled by Terraform Labs ("TFL"), a crypto-asset company based in Singapore that is run by its founder and CEO Kwon Do-hyung ("Do Kwon").  The value of UST depends on and is derivative of the value of "LUNA," another crypto-asset developed and centrally controlled by TFL.

4.      UST was advertised and sold to investors as a "safe" asset that could be used to earn substantial returns, including in the form of interest.  The respective prices of UST and LUNA both depended upon, and continue to depend upon, the efforts and success (or failure) of TFL.  For example, the amount of interest that investors earned from UST depended directly upon the success

---

[1] *See* https://www.binance.us/en/about (last visited on June 12, 2022).  Unless otherwise noted, all emphasis in quotations has been added.

(or failure) of TFL's efforts in maintaining the Anchor Protocol (the "Anchor Protocol"), which was the platform created and maintained by TFL that generated UST's interest payments.

5.     As an early supporter of and investor in TFL, Binance U.S.'s parent company is intimately familiar with UST and LUNA.  As recently as April 2022, Binance U.S.'s parent company falsely advertised UST as "safe," as shown in the following advertisement, which also advertises the ability of UST holders to earn passive profits:



AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

6.      Binance U.S's parent company also falsely advertised UST as "fiat-backed," as shown in the following advertisement Binance U.S.'s parent company ran about the relationship between LUNA and UST:



7.      Binance U.S. succeeded in its stated mission of "helping people across the U.S. access the world of digital assets" and was especially successful in the case of UST. Binance U.S. has a daily trading volume in crypto-assets worth hundreds of millions of dollars.

8.      Despite enjoying those fantastic profits, Binance U.S. plainly failed to comply with federal and state securities laws. Binance U.S. failed to disclose that UST is in fact a security, and that it is selling these securities, even though (i) there is no registration statement in effect for them, and (ii) Binance U.S. itself has refused to register with the U.S. Securities and Exchange Commission ("SEC") either as a securities exchange or as a broker-dealer.

9.      Binance U.S.'s failure to comply with the securities laws, and its false advertisements of UST, have led to disastrous consequences for Binance U.S.'s customers: in May 2022, in the span of just a few days, UST lost essentially all its value—a loss of approximately $18

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

billion. Investors who purchased UST on Binance U.S. were wiped out, learning quickly that UST was not "safe," "stable," or "fiat-backed."

10. Binance U.S. did not, however, stop selling securities created by TFL until after this action was filed. And, having reaped hundreds of millions—if not billions—of dollars in profits by selling securities without bothering to comply with federal and state laws, Binance U.S.'s parent company blithely added insult to injury when, on May 31, 2022, it began selling Luna 2.0—a new token which, just like LUNA, is centrally controlled by TFL. But international law enforcement *has* taken notice, with Interpol issuing a "Red Notice" in September, 2022 for Do Kwon's extradition on violations of South Korean securities laws stemming from the crash of UST/LUNA.

11. The securities laws exist to protect investors. These laws were enacted, as the Supreme Court has explained, "[i]n the wake of the 1929 stock market crash and in response to reports of widespread abuses in the securities industry" and "embrace a fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.*" *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 170–71 (1994) (cleaned up).

12. In short, if Binance U.S. wants to enjoy the many benefits of operating in the U.S. market, it must comply with U.S. federal and state securities laws. Yet Binance U.S. has chosen not to do so. Even though UST and LUNA are both securities, neither is registered with the SEC nor any state regulator. As a result, purchasers do not have access to the disclosures that accompany the issuances generally required of publicly traded securities—the precise disclosures designed to avoid a repeat of the 1929 stock market crash and the Great Depression that followed.

13. Binance U.S. has also failed to register under federal or state law as a securities exchange, which it is. As SEC chair Gary Gensler recently told the Senate Banking Committee, Binance U.S. and other exchanges have not registered with the SEC "even though they have dozens of tokens that may be securities." As to UST and LUNA, there is no doubt that they are securities.

14. Binance U.S.'s failure to comply with the securities laws critically enables bad actors like TFL to harm investors. In fact, Binance U.S.'s business model is premised on enabling these bad actors: Binance U.S. profits from every trade, and therefore has a stark incentive to sell crypto-

assets irrespective of their compliance with the securities laws. From Binance U.S.'s perspective, the less disclosure, the better, as more disclosure about the riskiness of crypto-assets will predictably lead investors to trade certain assets less and reduce transaction volume and Binance U.S.'s astonishing profits.

15.     Accordingly, because Binance U.S.'s sale of UST violates both federal and state law, Plaintiff, individually and on behalf of all persons or entities who transacted in UST on Binance U.S. during the Class Period (the "Class"), brings claims to recover damages, consideration paid for UST, and trading fees, together with interest thereon, as well as attorneys' fees and costs, to the fullest extent permitted by law.

## PARTIES

16.     Lead Plaintiff Michiel Nuveen is a resident of North Dakota. Like other members of the Class, Nuveen purchased UST on Binance U.S., and pursuant to contracts with Binance U.S., during the Class Period.

17.     Defendant BAM Trading Services Inc. is a Delaware corporation headquartered in Palo Alto, California, that operates under the trade name Binance U.S.

18.     Defendant Brian Shroder is the CEO of Binance U.S. and was at all relevant times a control person over Binance U.S. Shroder is a resident of California.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiff and most members of the proposed Classes are citizens of a state different from Defendants.

20.     Subject matter jurisdiction of this Court is further proper under 28 U.S.C. § 1331 because Plaintiff asserts claims under Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77l(a)(1), 77o.

21.     The Court has personal jurisdiction over Defendants. Both Defendants are citizens of California. Moreover, Defendants transacted business, maintained substantial contacts, and,

committed overt acts in this District in furtherance of the violations of the securities laws described in this Complaint.

22.     Jurisdiction of this Court is also founded upon Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1) and 29(b), 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b).

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this Complaint took place in this District.

## FACTUAL ALLEGATIONS

**I.  BACKGROUND ON CRYPTO-ASSETS, CRYPTO-ASSET EXCHANGES AND BINANCE U.S.**

### A.     The Blockchain And Crypto-Assets Generally

24.     By way of background, this case concerns crypto-assets.  Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer.

25.     Bitcoin was the world's first major crypto-asset.  Although the potential of fully digital assets had previously been recognized, Bitcoin's novel architecture provided three key traits that enabled it to succeed: It is a secure medium of exchange, it is "mined," and it is decentralized.

26.     This decentralization distinguishes Bitcoin from other assets.  For example, the value of corporate stocks and bonds, regardless of their structure, is tied to the success of the issuing corporation.  The value of government bonds is tied to the credit of the government that issues them. The value of a currency is tied to the issuing nation, reflecting factors like its economy, political stability, and the practices of its central bank.  None of this is true for Bitcoin.

27.     The blockchain has become the foundational technology for crypto-assets.  While crypto-assets vary tremendously, they generally rely on the blockchain to ensure that transactions are secure and non-duplicable.

28. Control of crypto-assets is attested primarily through cryptographic keys. These cryptographic keys have two components: a public key and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto-assets.

29. To use Bitcoin as an example, the public key is used to produce the Bitcoin address. As with the account number of a conventional bank account, a Bitcoin address is a destination for transfers of Bitcoin. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters, such as 1s5F or R3w9. As with a lengthy PIN or password for a conventional bank account, a private key allows the owner of a Bitcoin address to access his or her Bitcoin.

30. Just as one transferring funds to a conventional bank account needs to know the account number for that account, those who wish to transfer Bitcoin need to know the recipient's Bitcoin address. With the recipient's address, a transferor can use his or her private key to authorize the transfer of Bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

31. A transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is, anyone could see that Bitcoin address 1s5F transferred 10.3 Bitcoin to Bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are neither recorded on the blockchain nor are they accessible to the public.

**B.    Stablecoins**

32. The advent of Bitcoin in 2009 introduced the promise of a decentralized and programmable form of digital money. The value of many crypto-assets, however, is highly volatile, which can be an undesirable feature for a medium of the exchange.

33. A "stablecoin," as the name implies, is a digital asset whose value is supposed to be stable, not volatile. A stablecoin is designed to maintain a consistent value relative to one or more assets, such as a fiat currency (*e.g.*, the U.S. dollar, the Euro, the Japanese yen etc.) or debt obligations (*e.g.,* short-dated U.S. government obligations). Potentially unlike the underlying asset

(*e.g.*, if that asset is a debt obligation), the stablecoin in theory can be transferred between parties across borders instantaneously with minimal transaction cost.

34.     One of the first stablecoins, Tether (also known as "USDT"), illustrates that the promises of the backers of stablecoins do not always match reality.  Launched in 2014, Tether Holdings Ltd. (the company that issues USDT) originally claimed that each USDT minted would "be backed one-to-one by a fully auditable reserve of [U.S.] dollars."  Ostensibly, a USDT holder could exchange his or her USDT for an equal number of U.S. dollars.

35.     Regulators and the investing public, however, have expressed significant concern over whether USDT is truly backed by an equal number of dollars.  Indeed, in 2021, the Commodities Futures Trading Commission ordered Tether Holdings to pay $41 million in penalties because "from at least June 1, 2016 to February 25, 2019, [the company] misrepresented to customers and the market that [it] maintained sufficient U.S. dollar reserves to back every USDT."[2]

36.      There are now many stablecoins in circulation that purport to be backed by different types of assets.  As of the time of this filing, the market capitalization of all stablecoins is more than $152 billion.

## C.     Algorithmic Stablecoins

37.     Whereas most traditional stablecoins are backed by non-digital assets, "algorithmic stablecoins" are a special type of stablecoin that typically consist of an arrangement with a second digital asset, with the relationship between the two tokens managed through an algorithm in such a way that the stablecoin should remain pegged to its reference asset (such as the U.S. dollar).

38.     For example, a given algorithmic stablecoin may purport to be worth $1 dollar.  The issuer of the algorithmic stablecoin, however, does not itself hold dollars for which the algorithmic stablecoin holders can exchange the stablecoin.  Instead, the algorithmic stablecoin's value is kept pegged to the dollar by reference to a second digital asset.  At a high level, the algorithm underlying the algorithmic stablecoin monitors the price of the underlying digital asset and constantly acts (by

---

[2] https://www.cftc.gov/PressRoom/PressReleases/8450-21.

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

increasing or decreasing supply) to keep the price of the stablecoin pegged to the dollar. The algorithm's promise, therefore, is to keep the price stable.

39. In the case of the algorithmic stablecoin UST—the subject of this lawsuit—TFL purported to keep the value of UST pegged to $1 stabilized through a system of supply control and profit-taking arbitrage incentives related to LUNA.

**D.    Crypto-Exchanges And Binance U.S.**

40. Just as traditional stock exchanges enable investors to trade stocks, crypto-exchanges enable investors to trade crypto-assets.

41. At a high level, there are two primary types of crypto-exchange: decentralized exchanges and centralized exchanges. Decentralized exchanges may use the blockchain itself to match and execute transactions among traders. Generally, for decentralized exchanges, there is no intermediary individual or corporation that matches or clears transactions; instead, a decentralized exchange uses a blockchain technology called a "smart contract" to automatically facilitate trading. While different decentralized exchanges use different approaches, what they have in common is that the crypto-assets exchanged are transferred between individual accounts. Thus, if Angela exchanges one Bitcoin for 10 Ethereum using a decentralized exchange, her one Bitcoin will be sent to Brian, another user on the platform, and Brian's 10 Ethereum will be sent to Angela.

42. These decentralized exchanges resemble Craigslist in their operation. Just like a purchase of a collectible baseball card on Craigslist involves one user sending money and the other sending the card, so too do transactions on decentralized exchanges involve customers sending each other the goods being transacted. These decentralized exchanges, like Craigslist, do not own or hold the assets in question—they simply provide a platform for exchanges between users, along with certain features designed to facilitate trading (*e.g.*, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee.

43. Binance U.S. is an example of a centralized exchange for crypto-assets. Generally, to trade on Binance U.S., a customer creates an account. Binance U.S. then provides the customer

with a deposit address that the exchange controls. When the customer deposits crypto-assets into the deposit address, Binance U.S. credits the customer's trading account with the corresponding crypto-asset and transfers the crypto-asset into one of Binance U.S.'s internal addresses for storage.

44. The trades conducted within Binance U.S., however, do not involve the transfer of any assets between users. Instead, it is Binance U.S. that faces both the buyer and the seller. Thus, if Angela wishes to trade one Bitcoin for 10 Ethereum on Binance U.S., Binance U.S. will update its internal records to debit Angela's account one Bitcoin and credit the account with 10 Ethereum; no actual crypto-assets are moved on the blockchain. Nor is there any sense in which Angela's Bitcoin is transferred to anyone other than Binance U.S.: while Binance U.S. may use other traders' orders to determine the relative prices of crypto-assets and the rate at which they are exchanged, the only actual transactions that occur are between (a) the buyer and Binance U.S. and (b) the seller and Binance U.S. Accordingly, the buyer and seller are not in privity with one another. When a user wants to withdraw crypto-assets from Binance U.S. or another centralized exchange, she tells the exchange the address into which she would like her crypto-assets transferred. The exchange then debits the user's account and transfers a corresponding amount of crypto-asset from the exchange's reserves to that address. The withdrawn assets come directly from the centralized exchange.

45. As a centralized exchange, Binance U.S. places all deposited assets into a centralized wallet and reflects transactions on its platform only through internal updates to each customer's account. The following table shows the fees charged by Binance U.S. based on USD transaction volume:

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

**Trading Fee Structure**                                                    ⓘ What does "Maker/Taker" mean?

🟢 Use **BNB** to pay for fees, enjoy **25% off**  ⓘ

| VIP Level | 30d Trade Volume (USD) | Tier 0 Maker | Tier 0 Taker | Tier I Maker | Tier I Taker | Tier II Maker | Tier II Taker |
|-----------|------------------------|--------------|--------------|--------------|--------------|---------------|---------------|
| VIP 1 | <$10K | Free | Free | 0.0750% | 0.1500% | 0.3000% | 0.4500% |
| VIP 2 | $10K - $50K | Free | Free | 0.0750% | 0.1500% | 0.1875% | 0.3000% |
| VIP 3 | $50K - $100K | Free | Free | 0.0750% | 0.1500% | 0.1125% | 0.1875% |
| VIP 4 | $100K - $1M | Free | Free | 0.0450% | 0.1350% | 0.0750% | 0.1500% |
| VIP 5 | $1M - $20M | Free | Free | 0.0225% | 0.0675% | 0.0600% | 0.1350% |
| VIP 6 | $20M - $100M | Free | Free | Free | 0.0375% | 0.0375% | 0.1125% |
| VIP 7 | $100M - $300M | Free | Free | Free | 0.0375% | 0.0150% | 0.0750% |
| VIP 8 | $300M - $500M | Free | Free | Free | 0.0375% | Free | 0.0600% |
| VIP 9 | ≥$500M | Free | Free | Free | 0.0375% | Free | 0.0375% |

## II. THE TERRA (LUNA / UST) ECOSYSTEM

### A. The Creation Of The Terra Ecosystem

46. UST and LUNA are crypto-assets that exist as part of a broader Terra ecosystem that was centrally developed by TFL and, among others, TFL's founders Do Kwon and Daniel Shin. The Terra ecosystem came to encompass numerous "decentralized applications" or "dApps"[3] and protocols,[4] such as the Anchor Protocol—a lending and borrowing platform—and the Mirror Protocol—a platform for trading "mirrored" or synthetic assets, including U.S. stocks traded on major U.S. exchanges (the Mirror Protocol is the subject of an ongoing SEC investigation).

47. Do Kwon is a 30-year old South Korean computer science graduate of Stanford University. He worked at Microsoft and Apple before becoming what the New York Times calls a "trash-talking crypto founder" responsible for the ultimate crash of UST and LUNA.[5] Do Kwon earned that notoriety through taunts aimed at his critics such as: "I don't debate the poor." In

---

[3] A "decentralized application" is a digital application that runs on a blockchain network.

[4] A "protocol" is essentially a set of rules or foundational layer of code that governs how a system functions.

[5] https://www.nytimes.com/2022/05/18/technology/terra-luna-cryptocurrency-do-kwon.html.

addition to LUNA/UST, Do Kwon is also responsible for the launch of another failed algorithmic stablecoin project, Basis Cash.

48.     Shin is a graduate from the University of Pennsylvania's Wharton School and was described by TFL as "one of the best known entrepreneurs and investors in East Asia."[6]  Shin eventually left TFL.

49.     The first step in the tokenization of the Terra ecosystem was the launch of LUNA, the "native" digital asset of the Terra blockchain.  Do Kwon has called LUNA his greatest invention.

50.     TFL has described LUNA "as the native staking asset from which the family of Terra stablecoins derive their stability, utility, and value, [which] acts both as collateral for the entire Terra economy and as a staking token that secures the PoS network.  Luna can be held and traded as a normal crypto-asset but can also be staked to accrue rewards in the network generated from transaction fees. Luna can also be used to make and vote on governance proposals."

51.     TFL has advertised LUNA as "backed by" by the parent company of Binance U.S., which Plaintiff refers to as "Binance-Asia."  Binance-Asia invested in TFL and received LUNA tokens in exchange, the value of which eventually reached $1.6 billion.

52.     In April 2019, Do Kwon and several co-authors released the promotional "Terra whitepaper," which describes the plan to create "Terra Money" in the form of an algorithmic stablecoin that, when pegged to the U.S. dollar, would become UST.

53.     In September 2020, Do Kwon announced the launch of UST through the secondary crypto-asset exchange Bittrex Global.  Do Kwon touted UST as "the first decentralized stablecoin that is scalable, yield bearing and interchain."  Trumpeting the growth potential of UST, Do Kwon compared UST to a different Terra stablecoin pegged to the South Korean Won, observing that that stablecoin "has been exploding in growth and adoption in Korea, and is today the most actively adopted stablecoin by usership."  Do Kwon explained that UST was a "yield bearing" asset and promoted "the upcoming launch of Anchor, a savings protocol offering stable yield on Terra

_____

[6] https://kando.tech/person/daniel-shin.

stablecoins" such that "[UST] will soon be the first censorship-resistant dollar to offer a savings experience competitive with the traditional savings account through Anchor."

**B.  The Interrelationship Of UST/LUNA As Part Of An Economic Scheme**

54.  UST and LUNA are part of a single economic scheme or arrangement.  In publicly available informational videos that have been viewed hundreds of thousands of times, TFL describes the way that UST and LUNA work together as a series of understandings, transactions, and contracts.  According to TFL, UST is

> built on Terra's blockchain.  The price of one UST is determined by how many people want it, and by how much UST is available.  Let's imagine the entire Terra economy as a pool.  The size of the pool is determined by the total supply of UST.  If more people want UST the tide rises, and if less people want UST the tide falls.  The height of the pool represents the value of each UST.  If you can do more with UST, like buy coffee or invest in stocks, more people will want to buy UST driving up its price.  To bring back the water level to one dollar, we can expand the pool by introducing a new supply of UST.  But where does new UST come from?

55.  According to TFL, the central feature of UST as an "algorithmic" stablecoin lies in its guaranteed exchangeability with LUNA and corresponding supply control:

> At Terra we've designed a machine that swaps one dollar worth of Luna to one UST.  Investors who predict UST will be more useful and used in the future can buy and hold Luna.  When the value of UST rises above one dollar, any Luna holder can swap one dollar worth of Luna for one UST and sell each UST for more than a dollar, making a profit.  The newly introduced UST expands the pool, bringing its price back to the one dollar peg.  Now, Luna is more scarce and therefore more valuable.

56.  Put differently, the LUNA/UST pair was marketed as follows:  when the price of UST goes above $1 due to increasing demand, the Terra algorithm stabilizes the price by allowing LUNA holders to mint (*i.e.,* create more) UST—which increases its supply—by exchanging $1 of LUNA— which is burned (*i.e.*, removed from circulation) to reduce LUNA supply.  The trader is incentivized to make that exchange because she can then sell her newly-minted UST for more than $1 at a profit.  Similarly, when demand for UST decreases, causing its price to go below $1, holders of UST are

incentivized by the arbitrage opportunity to mint $1 of LUNA (which increases its supply) in exchange for UST (which also decreases UST's supply). At least this was the marketing.

57. TFL also purported to ensure that UST would be a source of profits through arbitrage, stating: "During times of contraction, any UST holder can profit by swapping UST for Luna raising the price of one UST back to one U.S. dollar. As UST becomes more useful in the long run, Luna holders are rewarded for assuming the risk of short-term price volatility."

58. Besides arbitrage, the Terra ecosystem also relies upon "seigniorage," which refers to the profit that a currency-issuer (traditionally, a government) makes through the issuance of the currency. Although issuers of traditional currencies typically incur certain transaction costs that reduce their seigniorage and incentive to issue currency, the Terra whitepaper makes clear that, because UST and LUNA are created from thin air, there is no seigniorage cost to the ecosystem. Indeed, according to the Terra whitepaper, seigniorage is "the value of newly minted currency minus the cost of issuance (which in this case is zero)."

59. Fiat currency seigniorage reverts to the government; UST/LUNA seigniorage reverts to the "community." As the Terra whitepaper explains: "So how exactly does the machine work? When Luna is swapped for UST a certain percentage is burned and the rest piles up in a community pool. From the other end, new UST is printed. This process is called *seigniorage*. As more applications are built using UST massive demand will cause price to deviate above the one-dollar peg, meaning we need more Luna swapped for UST to expand supply."

60. Through seigniorage, TFL explains: "Luna becomes more and more valuable, and the community pool accumulates more funds. The funds in the community pool are reinvested to build more apps that use UST, and the virtuous cycle of growth continues. Investors who hold Luna see its value rise during times of expansion, and if they choose to stake earn transaction fees in UST. Even when demand for UST is low, Terra's algorithm automatically increases fees so that validators are always rewarded with a steady cash flow of UST." Thus, LUNA allows holders to "earn passive income."

61. According to TFL, LUNA holders are entitled to governance rights analogous to the rights associated with a traditional equity security: "Luna holders can participate in Terra's governance process, proposing or voting for changes in transaction fees, seigniorage allocation, tax rate, and many more." Thus, LUNA "collateralizes UST . . . much like the moon—which stabilizes the earth's rotation—Luna and its stakers are essential to Terra's stability."

## C. The Anchor Protocol Created By TFL Formed An Essential Part Of The UST/LUNA Economic Scheme

62. In July 2020, as Do Kwon had previewed, TFL launched the Anchor Protocol to provide a passive profit-making incentive to UST holders. Nicholas Platias, who was the Head of Research at TFL, announced the launch of the Anchor Protocol as a saving and lending protocol that, he explained, "facilitates depositing and borrowing of Terra stablecoins." Platias elaborated that the Anchor Protocol would "offer depositors a stable return" as a "household savings product powered by cryptocurrency" and the "gold standard for passive income on the blockchain." The Anchor Protocol promised lenders annual percentage yields of nearly 20%, and its total value locked ("TVL") swelled to $17 billion—about 70% of all value in the Terra ecosystem. And in fact Anchor paid those rates to UST holders, including as of June 6, 2022:



AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

63.     Coupled with the Anchor Protocol, investors bought UST in droves, looking to capitalize on the promise of tremendous investment returns that, according to the marketing, was safe.

64.     In insults levied at his critics—some of whom accused LUNA/UST of being a Ponzi scheme—TFL and Do Kwon talked a big game, rejecting such accusations.  TFL and Do Kwon maintained that the algorithm underlying UST was sound and its reliance on LUNA appropriate and that UST was a safe investment for investors, who should store UST on the Anchor Protocol to realize fantastic profits.  Binance U.S.'s parent company echoed such claims, claiming that UST was "safe" and promoting UST and the Anchor Protocol.

**D.     Despite Claiming That The Algorithm Underlying UST Was Sound, TFL Establishes Non-Luna Reserves To Protect The UST Peg**

65.     Perhaps in recognition that UST was in fact susceptible to a "death spiral" in the event of rapidly declining demand in LUNA resulting in a bank run on UST, TFL ultimately decided to depart from the Terra whitepaper's promise of a purely "algorithmic stablecoin" backed by LUNA by relying instead on collateralizing its value through Bitcoin and other non-LUNA reserves.  This was prelude to the crash that would wipe out the value of UST.

66.     On January 19, 2022, Do Kwon announced the launch of the Luna Foundation Guard (the "LFG" and collectively with TFL and Do Kwon, the "Terra Organization"), an organization "mandated to build reserves supporting the $UST peg amid volatile market conditions" and to "allocate resources supporting the growth and development of the Terra ecosystem" through grants.

67.     On March 23, 2022, Jump Trading, one of the investors behind the LFG, proposed a mechanism for how to deploy Bitcoin reserves to prop up UST's price in a crisis.

68.     On March 28, 2022, the LFG's Bitcoin wallet address purchased 27,000 bitcoin worth roughly $1.3 billion.  Over the next month, LFG continued to buy up Bitcoin reserves to defend the UST peg in the event of a crisis.  As a result of these open market purchases by LFG, LUNA's price soared.

69.     On April 5, 2022, LUNA reached an all-time high of $119.20.

70.     On April 14, 2022, TFL gave LFG 10 million LUNA tokens, which at the time had a value of $820 million.

71.     Do Kwon ultimately wanted to build a $10 billion Bitcoin reserve to back UST's peg, stating in March 2022 that this reserve would also be funded by seigniorage: "It's not 10B today - as UST money supply grows a portion of the seigniorage will go to build BTC reserves bridged to the Terra chain[.]" But Do Kwon never reached $10 billion, and the reserves that the Terra Organization had accumulated proved insufficient to ward off the impending depegging of UST and its subsequent crash.

**E.     UST Collapses, Wiping Out Billions Of Dollars In Investments**

72.     By April 4, 2022. LUNA was trading at $116.41, with a market capitalization of over $40 billion:



AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC



73. And by May 5, 2022, the market capitalization of UST had reached an incredible $18.73 billion, with much of the UST stored on Anchor, where investors raised incredible passive profits:



74. The collapse of the Terra ecosystem was even more sudden than its rise.

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

75. On May 7, 2022, the crash of UST began. On that day alone, UST owners swapped $85 million worth of UST for a competitor stablecoin called USDC.

76. On May 8, 2022, following a series of large withdrawals of UST on the Anchor Protocol (and illustrating the central connection between UST and the Anchor Protocol), the price of UST dipped to $0.985, below the $1 peg.

77. On May 9, 2022, UST holders withdrew approximately $5 billion in UST from the Anchor Protocol, reflecting an incredible capital flight. The price of UST fell to $0.35.

78. On May 9, 2022, Do Kwon sought to reassure investors, tweeting: "Deploying more capital – steady lads."



79. By May 11, 2022, the market capitalization of LUNA was just $541 million and its price had declined to $.004:



AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC



80. By May 12, over the preceding 24 hours, the price of LUNA had fallen 96%. Without the backing of LUNA, the price of UST crashed to 15 cents:



81. A few days later, LFG confirmed that it had attempted to maintain UST's peg, depleting its Bitcoin reserves from 80,000 Bitcoin (worth approximately $2.883 billion) to just 313 Bitcoin (worth approximately $11.2 million). In other words, LFG had failed in its efforts.

82. By the end of May 2022, the price of UST was down to approximately 1 cent – leaving investors who had purchased and held the supposed stablecoin with losses of approximately 99%.

83. This collapse of UST was devastating for investors, who were made to believe that UST was a "safe" "fiat-backed stablecoin."

84. An incredible number of investors lost much, if not all, of their life savings. As the New York Times noted, "retail traders now grapple with devastating losses" that some have said were caused by the "irresponsible behavior of the institutions backing Mr. Kwon." Binance U.S. is one of those institutions.

85. The stories of retail investors are horrific, as they had investments wiped out, losing so much on the irresistible promise of endless and safe profit. For example, some investors took out home equity loans to purchase UST and have thus been left severe debt.



86. Other investors were in such despair that they commented in online forums that they were contemplating suicide as a result of the UST/LUNA crash.

87. The harm is not limited just to UST/LUNA investors, because as the New York Times reported, "[t]heir meltdowns had a domino effect on the rest of the cryptocurrency market, tanking the price of Bitcoin and accelerating the loss of $300 billion in value across the crypto economy." In May 2022, Secretary of the Treasury Janet Yellen even testified to Congress that "TerraUSD experienced a run and declined in value" illustrating that "there are risks to financial stability."

88. The harm suffered as a result of the UST/LUNA scheme cannot be understated—and must be remedied.

### III. THE SEC HAS REPEATEDLY INSTRUCTED THAT CRYPTO-ASSETS LIKE UST AND LUNA ARE SECURITIES

89. The SEC has repeatedly both provided guidance and engaged in enforcement actions on the basis that crypto-assets are securities. For example., the SEC examined how crypto-assets could qualify as securities under existing law in the SEC's *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO* (the "2017 DAO Report").[7] In that report, the SEC examined the application of the Securities Act and the Exchange Act to the issuance and trading of crypto-assets.

90. With respect to the application of the Securities Act to crypto-assets, the SEC concluded (1) that crypto-assets may qualify as securities pursuant to the Securities Act and the test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and that (2) issuers of crypto-assets that fit within the definition of security under the *Howey* test are subject to the registration and reporting requirements of the Securities Act.[5]

91. Similarly, the SEC concluded that crypto-asset trading platforms may satisfy the meaning of "exchange" as defined by the Exchange Act if they "provide[] users with an electronic system that matched orders from multiple parties to buy and sell [digital assets] for execution based on non-discretionary methods." The SEC noted that a "system that meets the criteria of Rule 3b-16(a), and is not excluded under Rule 3b16(b), must register as a national securities exchange pursuant to Sections 5 and 6 of the Exchange Act or operate pursuant to an appropriate exemption."

92. Following a boom of initial coin offerings ("ICOs") in 2017, the SEC issued further guidance as to the application of the *Howey* test to crypto-assets in a 2019 report entitled *Framework*

---

[7] *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO,* SECURITIES AND EXCHANGE COMMISSION (Jul. 25, 2017), https://www.sec.gov/litigation/investreport/34-81207.pdf.

*for "Investment Contract" Analysis of Digital Assets* (the "*Framework*").[8]  The report reiterated that whether a particular crypto-asset is an investment contract, and thus a security, requires an analysis of the facts and circumstances surrounding the crypto-asset's creation and issuance.

93.     Following this guidance, the SEC has engaged in enforcement actions on the basis that several different tokens are in fact securities.  On September 30, 2019, Block.one, the issuer of the EOS crypto-asset, agreed to pay $24 million to settle charges that it had raised several billion dollars through an unregistered securities offering when it conducted the ICO for the EOS token.  Similarly, on December 22, 2020, the SEC brought charges against Ripple Labs Inc. and two of its executives, alleging that they had raised over $1.3 billion through an unregistered crypto-securities offering through the ICO of XRP.  The case is ongoing.

94.     On July 21, 2021, speaking to the American Bar Association, SEC Chairman Gensler commented on the fact that digital asset trading platforms were offering tokens that are priced off securities and resemble derivatives, stating:

> Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual product that provides synthetic exposure to underlying securities.  These platforms—whether in the decentralized or centralized finance space—are implicated by the securities laws and must work within our securities regime.

## IV. UST IS AN UNREGISTERED SECURITY

95.     Although unregistered, UST is a security because it is an investment contract, or, in the alternative, because it is a derivative product of LUNA.  The first bona fide public offering of UST occurred on or about September 2020.

### A.     UST Is An Investment Contract

96.     Analysis of the facts and circumstances surrounding UST tokens shows that they are investment contracts under *Howey* and are therefore securities.   Under *Howey*, a contract, transaction, or scheme is an investment contract if it involves (1) an investment of money (2) in a

---

[8]  *Framework for "Investment Contract" Analysis of Digital Assets,* SECURITIES AND EXCHANGE COMMISSION (Apr. 3, 2019), https://archive.ph/4wS5f (the "*Framework*").

common enterprise (3) with the expectation of profit (4) from the essential efforts of another. UST tokens involve contracts, transactions, and schemes, including a series of understandings, transactions, and undertakings, that when viewed as a whole, amount to a security.

*1.      UST Purchasers Made An Investment Of Money*

97.    Purchasers of UST, including on Binance U.S., acquired UST in an exchange of value. As the SEC has noted in the *Framework*, the "first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

*2.      UST Purchasers Invested In A Common Enterprise*

98.    Purchasers of UST, including on Binance U.S., understood that they were investing money in a common enterprise. TFL pooled the money received from UST purchasers and seigniorage, and then used it to develop the Terra ecosystem as well as maintain and expand it. Each UST token is fungible with all others, and the fortunes of all UST investors are "linked to each other [and] to the success of [the Terra Organizations'] efforts." Indeed, the SEC has stated that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists."

99.    The Terra whitepaper explained that the fortunes of UST users were linked together, since "a medium of exchange is mainly driven by its network effects" and thus in order to succeed it had to "to maximize adoption in order to become useful." The Terra whitepaper, entitled "Terra Money: Stability and Adoption," observes a critical difference of UST compared to other crypto-assets was the "clear plan for the adoption" for UST that TFL had developed. As Do Kwon emphasized, the central premise of UST is that all the fortunes of UST holders are linked with the success of the Terra ecosystem, since "currencies are ultimately backed by the economies that use them":

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC



100. Indeed, during the beginning of the crash of UST/LUNA, TFL emphasized that, "MFers we are the peg," meaning that the success of UST and LUNA investors is linked with each other and with the Terra ecosystem itself:

101. The Terra whitepaper also explained that the fortunes of UST investors were linked to the success of the overall enterprise and to the fortunes of TFL and the Terra network's developers

and promoters. The whitepaper makes clear that, in order to drive the adoption of the Terra network and UST, the protocol would have a "growth-driven fiscal policy" relying upon incentivizing the development of "Terra Platform DApps [that] will help to drive growth and stabilize the Terra family of currencies by diversifying its use cases." The Terra whitepaper explains further that a "portion of seigniorage goes to the Treasury to fund fiscal stimulus" to create "strong incentives for users to join the network with an efficient fiscal spending regime, managed by a Treasury, where multiple stimulus programs compete for financing . . . they will be financed with the objective to increase adoption and expand the potential use cases." Indeed, "on average 50% of seigniorage is granted to the Treasury" thus "returning seigniorage not allocated for stability back to its users." Further, when Do Kwon announced the creation of the LFG on January 19, 2022, he specified that it would "allocate resources supporting the growth and development of the Terra ecosystem" through grants.

102. In the midst of the UST/LUNA crash, Do Kwon emphasized the common enterprise between UST holders and TFL:



103. The statement reflects the reality that purchasers of UST tokens were investing in a common enterprise.

    *3.*    *UST Purchasers Had A Reasonable Expectation Of Profits*

104. Investors in UST, including purchasers of UST on Binance U.S., reasonably expected to receive profits from their investment in UST in multiple ways.

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

105.   For example, as Terra's whitepaper makes clear, purchasers of both UST and LUNA expect to earn profits through arbitrage.  The Terra algorithmic stablecoin system is premised on the ability of LUNA and UST holders to, according to the Terra whitepaper, "extract risk-free profit" from arbitrage opportunities between the price of LUNA and UST.

106.   The Terra whitepaper also explains that the Terra blockchain relies upon a Proof of Stake protocol that creates "predictable rewards in all economic conditions."  The Terra ecosystem accomplishes this profit-earning incentive by making it so that "[a]ll Terra transactions pay a small fee to miners" and through seigniorage, which means that the protocol "burns a portion of earned Luna, which makes mining power scarcer."

107.   And purchasers of UST had a reasonable expectation that they would be able to earn profits through staking on the lending the Anchor Protocol.  As of April 22, 2022, shortly before the UST/LUNA crash, an astonishing 72 percent of all UST was deposited on the Anchor Protocol to earn approximately 20% interest on deposits—an interest rate that has been called "nuts." TFL promoted these rates, driving the expectation of profits by UST purchasers:



108.   Indeed, there are few, if any, goods or services that can be directly purchased using UST.  Accordingly, all or nearly all UST traded on Binance U.S. is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

### 4.   UST Purchasers Expected Profits In Reliance On The Efforts Of Others

109.   The *Framework* provides that reliance on the efforts of others prong under *Howey* is likely to be met where "there are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a 'decentralized' network)."  Such efforts might include "actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, 'burning,' or other activities."  Investors in UST undoubtedly expected their profits to derive from the efforts of the Terra Organization.

110.   Further, with respect to the Anchor Protocol, TFL also took actions to support the market price of UST by working to ensure that purchasers of UST could make enormous profits through the Anchor Protocol.  In February 2022, TFL intervened to inject $450 million worth of UST into the Anchor Protocol's reserves to ensure that the Anchor Protocol could "tap into its reserves in order to pay lenders the promised yield" despite dwindling borrowing demand.  As Do Kwon tweeted at the time, TFL had ensured that the Anchor Protocol was "funded"—thereby guaranteeing UST purchasers' reasonable expectation of profits.

111.   The Terra Organization also consistently represented that UST represented "decentralized money" with Do Kwon tweeting:



AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

112. And Do Kwon and TFL advertised that UST represented "decentralized money."

113. In reality, TFL acts as a centralized responsible actor performing essential tasks for the Terra ecosystem, including supporting the price of UST.

114. For example, TFL performed tasks that were essential to the Terra ecosystem in its role in creating and maintaining "Terra Station," through which purchasers of UST and LUNA are able to "create a wallet, stake LUNA, send tokens, and participate in governance." Indeed, much of the functionality of the Terra ecosystem and Terra-backed tokens, including UST and LUNA, is directly provided by TFL.

115. In addition, a *Framework* factor going to the reasonable expectation of profits is "[t]he availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset." TFL marketed the availability of a secondary market for UST; indeed, TFL launched UST on a secondary market. For example, TFL retweeted the listing announcement of UST by secondary exchanges:



AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

116.    Binance-Asia was an early investor in Terra Labs, with its founder and CEO Changpeng Zhao ("CZ") noting that "[w]e invested in Terra as a part of a Binance Labs investment in 2018, and that was a $3 million investment." TFL directed UST holders and potential purchasers to Binance for updates and information:



117.    TFL also touted that investors could "earn" UST through engagement with Binance-Asia's promotional materials:

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC



118.   And during the crash of UST and LUNA, CZ made clear that Terra Labs' directly communicated with Binance-Asia, explaining that Do Kwon "was getting updates from our team. I was looking at the situation.  I was telling our team to communicate with [TFL] with specific requests.  [Do Kwon] needs to be more responsive.  He was somewhat slow in responding to us, to Binance.  We're the biggest liquidity provider for him, and when we reach out, most other projects will always respond to us, and he was kind of slow."  CZ's comments make clear not only the critical role that Binance played as the "biggest liquidity provider" for UST, but also that the efforts of TFL and Do Kwon critically affect the failure or success of the enterprise, including UST.

119.   Still further, the Terra Organization ultimately decided to depart from the Terra whitepaper's promise of an "algorithmic stablecoin" relying on its exchangeability with LUNA to maintain its 1:1 dollar peg.  Instead, the Terra Organization decided to provide additional support for the dollar peg of UST by collateralizing its value through Bitcoin reserves, as noted above.

120.  Once UST was backed by Bitcoin, the price of both UST and LUNA undoubtedly became dependent on the efforts of LFG.  For example, once UST was backed by Bitcoin, and UST went off its peg, LFG attempted to reestablish the peg by selling its Bitcoin holdings to inject liquidity into the market for UST.  Underscoring the enormity of its intervention, on May 5, 2021, TFL and LFG announced that they had acquired approximately $1.5 billion in Bitcoin reserves:



121.  But even that was not enough.  Further illustrating the interconnectedness of LFG and TFL with each other and to LUNA and UST, LFG defended the UST peg through the efforts of TFL, which "managed & executed all finance, administrative, & operational functions & support" on behalf of LFG to execute the trades:

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

> **LFG | Luna Foundation Guard** @LFG_org · May 16
> 5a/ On May 10, when $UST had fallen to $0.75, pursuant to a Master Services Agreement dated January 10, 2022 through which TFL managed & executed all finance, administrative & operational functions & support as requested,
> 💬 32    🔁 137    ♡ 933    📤

> **LFG | Luna Foundation Guard** @LFG_org · May 16
> 5b/ TFL, on behalf of the Foundation, executed the following exchange trades in a last ditch effort to defend the peg:
> 💬 35    🔁 138    ♡ 884    📤

> **LFG | Luna Foundation Guard** @LFG_org · May 16
> 6/ Sold 33,206 $BTC for an aggregate 1,164,018,521 $UST
> 💬 105    🔁 327    ♡ 1,080    📤

> **LFG | Luna Foundation Guard** @LFG_org · May 16
> 7/ On May 12, LFG swapped 883,525,674 $UST to 221,021,746 $LUNA & staked this across a range of validators to protect against a possible governance attack as the amount of $LUNA continued to increase.
>
> All transactions described above have now been completed.
> 💬 111    🔁 200    ♡ 1,121    📤

> **LFG | Luna Foundation Guard** @LFG_org · May 16
> 8/ As of now, the Foundation's remaining reserves consist of the following assets:
> · 313 $BTC
> · 39,914 $BNB
> · 1,973,554 $AVAX
> · 1,847,079,725 $UST
> · 222,713,007 $LUNA (of which 221,021,746 is currently staked with validators)
> 💬 966    🔁 2,613    ♡ 3,680    📤

122.   As described further above, LFG was forced to sell a substantial portion of its Bitcoin holdings at a substantial loss to save the plummeting UST, which fell from $0.995 to $0.60 in a matter of hours, causing LUNA to fall more than 50% on the same day.  In the midst of the crash, Do Kwon made clear that it was the centralized efforts of the Terra Organization's infusion of new capital that was propping up the UST peg, which users on Twitter rightly noted at the time contradicted the Terra Organization's claims of decentralization:



123.   Ultimately, LFG's sale of billions of dollars in Bitcoin was a failed effort to reestablish the 1:1 USD to UST peg, with Do Kwon admitting that all but 313 Bitcoin had been used to defend the price of UST:



124.   Over the next several days, LUNA declined in value to $0.00001 (from a high of over $119).  Do Kwon has conceded that these efforts demonstrated that the Terra ecosystem never achieved decentralization and was reliant on the managerial efforts of the Terra Organization:



125. That TFL was always, under the *Framework*, "performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality" is also clear from its other actions during the UST/LUNA crash.

126. TFL unilaterally halted the Terra blockchain during the UST/LUNA crash to buy time "to come up with a plan to reconstitute" the Terra network. TFL restarted the Terra blockchain once it had provided a software update to avoid attacks against the network in the wake of the collapse of UST and LUNA. TFL made clear that its efforts were to try to "stop the bleeding" of UST—in other words, to try halt UST from depegging from the dollar:



AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

127.   These actions demonstrate that UST was only ever valuable if the team behind TFL, including the LFG and the core team of technology developers, committed the managerial efforts needed to develop, maintain, and promote the Terra network and its underlying algorithms.  As Do Kwon has admitted, UST derives its value from the network, such that even if UST did not exist, the network itself would be "worth preserving":



***

128.   Based on the foregoing facts, among others, UST is an investment contract and therefore a security.  However, UST has never been registered as a security.

**B.   UST Is Also An Unregistered Security Because It Is A Derivative Of LUNA, Another Unregistered Security**

129.   Independently, UST is also a security because it is a derivative of another security—namely, LUNA.  This conclusion is consistent with the August 3, 2021, remarks of SEC Chairman Gensler before the Aspen Security Forum that "a stable value token backed by securities . . . [is] subject to the securities laws and must work within our securities regime."

130.   UST is backed by LUNA.  UST is intended to maintain its 1:1 dollar peg through its exchangeability for $1 of LUNA.  As described in the Terra whitepaper, "Luna also serves as the most immediate defense against Terra price fluctuations" such that "[w]hen TerraSDR's price < 1 SDR, users and arbitragers can send 1 TerraSDR to the system and receive 1 SDR's worth of Luna." The Terra whitepaper also describes how the "system finances Terra price making via Luna" through the minting and burning of LUNA in response to exchanges for UST—in this way,

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

"volatility is moved from Terra price to Luna supply." Given that the value of UST is backed by a security, LUNA, UST is also a security.

131. UST is also an option to purchase LUNA. As the Terra whitepaper explains, "[t]he system uses Luna to make the price for Terra by agreeing to be counter-party to anyone looking to swap Terra and Luna at Terra's target exchange rate." That is, purchasers of UST are purchasing the right to buy LUNA at a specified price. An option to purchase a security is likewise a security.

132. LUNA is also a security because it meets the *Howey* test for an investment contract. Many of the reasons that LUNA is a security are explained above in Section IV.A, *supra*. To avoid repetition, Plaintiff incorporates those paragraphs by reference and adds the following for clarity:

   *1.    LUNA Purchasers Made An Investment Of Money*

133. Investors purchase LUNA through an investment of money—*i.e.*, they exchange value to acquire LUNA.

   *2.    LUNA Purchasers Invested In A Common Enterprise*

134. Purchasers of LUNA also invest in a common enterprise. TFL pooled the money received from LUNA purchasers and seigniorage, then used it to develop the Terra ecosystem as well as to maintain and expand it. Each LUNA token is fungible with all others, and the fortunes of all LUNA investors are "linked to each other [and] to the success of [the Terra Organizations'] efforts."

135. LUNA was marketed as deriving value from its ability to act as a governance token of the Terra blockchain. This governance right, which resembles the voting rights of many traditional securities, means that LUNA purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting UST and LUNA, as the governance is only valuable if the Terra blockchain is maintained.

   *3.    LUNA Purchasers Had A Reasonable Expectation Of Profits*

136. Purchasers of LUNA had a reasonable expectation that they would profit from their investment. That expectation was driven by the promotion of LUNA by the Terra Organization.

137.  *First*, like UST purchasers, LUNA purchasers also expected to make profits through arbitrage.  The algorithmic Terra stablecoin system is premised on the ability of LUNA and UST holders to "extract risk-free profit" from arbitrage opportunities between the price of LUNA and UST.

138.  *Second*, LUNA purchasers also expected to make profits through mining rewards.  Purchasers expected they would be able "to stake a native cryptocurrency Luna to mine Terra transactions."  It was so important for Terra that LUNA be able to be mined profitably, that the Terra whitepaper explained the profit potential of staking LUNA in mathematical terms:

$$P(t) = \frac{TotalRewards(t)}{LunaSupply(t)} - UnitMiningCost(t)$$

A purpose of the Terra protocol was to ensure that this formula would be positive no matter what over time.  As the whitepaper states:  "**the protocol creates predictable rewards in all economic conditions.**" (emphasis in original).    Indeed, the Terra whitepaper—based on a series of assumptions about transaction volume, fees, and LUNA burn rate—estimated a 15% annual increase in rewards for staking LUNA.  The whitepaper also graphically illustrated the phenomenal returns LUNA investors could expect:



AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

139. Do Kwon marketed the profits LUNA investors enjoyed, touting in the months before it crashed that LUNA was returning $4 billion in dividends "collected entirely by fees" and with "no inflation":



140. *Third*, LUNA investors expected LUNA's market price to appreciate. The Terra Organization actively encouraged secondary trading of investors speculating on the price of LUNA. For example, in the weeks before the crash of UST/LUNA, when someone questioned the price of LUNA on the basis that the Terra ecosystem was a "Ponzi scheme" and UST was not adequately collateralized, Do Kwon cavalierly dismissed the concerns:



141. And, until its sudden crash, the price of LUNA increased rapidly to a high of approximately $119 per token.

142. There are few, if any, goods or services that can be directly purchased using LUNA. To the extent that LUNA can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of LUNA.

39

Accordingly, all or nearly all LUNA traded on secondary exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

4. *LUNA Purchasers Expected Profits In Reliance On The Efforts Of Others*

143. LUNA purchasers relied upon the centralized managerial efforts of the Terra Organization to realize the profits that they expected from LUNA.

144. *First*, LUNA purchasers expected to receive a portion of the transaction fees of LUNA processed on the Terra network. The Terra whitepaper makes clear that "rewards from fees tend to increase when the economy grows and tend to decrease when the economy shrinks." LUNA purchasers relied upon the efforts of the LUNA organization to expand the Terra "economy" such that their fees would grow. As discussed above, a portion of LUNA seigniorage "goes to the Treasury to fund fiscal stimulus" which is "used as an efficient stimulus to drive adoption."

145. *Second*, as discussed above with respect to UST, TFL performed tasks that were essential to the Terra ecosystem and LUNA's value through its role in creating and maintaining Terra Station.

146. *Third*, as discussed above with respect to UST, the Terra Organization's attempt to back the UST 1:1 peg to the dollar through collateral reserve other than LUNA was a centralized effort meant to prop up the price of LUNA. When that centralized effort failed, the price of LUNA accordingly crashed, illustrating that LUNA purchasers were completely dependent upon the Terra Organization's efforts to maintain LUNA's market value.

147. *Fourth*, following the crash of UST/LUNA, TFL made clear that without its centralized managerial efforts, the Terra network's infrastructure would have been unable to support LUNA on an ongoing basis (called "LUNA classic" following the crash):

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC



148.  *Fifth*, TFL marketed the availability of a secondary market for LUNA.  For example, Do Kwon retweeted the listing announcement of LUNA by secondary exchanges:



***

149.  Based on the foregoing facts, among others, LUNA is an unregistered security.  And UST is accordingly an unregistered security as a derivative of LUNA.

## V. BINANCE U.S. LISTED AND SOLD UST EVEN THOUGH UST IS NOT REGISTERED, IN VIOLATION OF THE SECURITIES LAWS

150. Binance U.S. listed and sold UST on its platform beginning on or around April 13, 2022. Because UST is an unregistered security and because Binance U.S. offered UST for sale, Binance U.S. has sold unregistered securities to Plaintiff.

151. The structure of Binance U.S. means that it is the counterparty in every transaction in UST on Binance U.S. Customers only exchange funds and crypto-assets with Binance U.S. itself, and never with other users. All transactions in UST made on Binance U.S. are reflected only in Binance U.S. 's internal records, and Binance U.S. itself received all funds and provided all UST purchased. Binance U.S. is thus in privity with each Binance U.S. customer in each of their transactions, and is the seller whenever a customer buys a token on Binance U.S.

152. Moreover, Binance U.S. solicited UST for sale to earn trading fees; these solicitations were thus motivated at least in part by a desire to serve its financial interests.

## VI. BINANCE U.S. ILLEGALLY LISTED AND SOLD THE UST SECURITY EVEN THOUGH IT IS NOT REGISTERED AS AN EXCHANGE, IN VIOLATION OF THE SECURITIES LAWS

153. Binance U.S. satisfies the criteria of Exchange Act Rule 3b-16(a) and is not exempt under Rule 3b-16(b). Binance U.S. brings together orders of multiple buyers and sellers. Binance U.S. received and stored digital asset buy and sell orders for UST from their users. Binance U.S. provided the means for these orders to interact and execute through the combined use websites, mobile apps, order books, and pre-programmed trading rules protocols defined in the Binance U.S. trading engine. These established non-discretionary methods allowed Binance U.S. users to agree upon the terms of their trades in UST on Binance U.S. during the Class Period.

154. Binance U.S. is thus an "organization . . . which . . . maintains [and] provides a marketplace or facilities for bringing together purchasers and sellers" of digital assets. 15 U.S.C. § 78c. Because UST that was listed on Binance U.S. are securities, Binance U.S. meets the statutory definition of an exchange under the Exchange Act. *Id.*

## VII. BINANCE U.S. LISTED AND SOLD THE UST SECURITY EVEN THOUGH IT IS NOT REGISTERED AS A BROKER-DEALER, IN VIOLATION OF THE SECURITIES LAWS

155. Binance U.S.'s activities further meet the definition of a "broker-dealer" under the Exchange Act because Binance U.S. acts as both a broker and a dealer.

156. The Exchange Act defines "broker" in relevant part as an entity that is "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering. Binance U.S.'s activities with respect to UST meet either criterion.

157. Binance U.S.'s activities also meet the Exchange Act's definition of "dealer", which includes entities that are "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business." 15 U.S.C. § 78c(a)(5)A). During the Class Period, Binance U.S. operated as a dealer as defined by the Exchange Act by, *inter alia,* (1) holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for UST; (2) maintaining custody over Binance U.S. customers' UST; (3) by providing customers services such as allowing purchase of UST on credit; (4) by having a regular turnover inventory of UST; (5) by purchasing UST for accounts in Binance U.S.'s name (often at a discount); and (6) selling UST to investors for profit immediately or at a later time after being held in inventory.

## VIII. BINANCE U.S.'S ARBITRATION SCHEME IS PUNITIVELY DESIGNED TO DISCOURAGE RETAIL INVESTORS WITH LIMITED RESOURCES FROM FILING CLAIMS—IT IS UNCONSCIONABLE AND UNENFORCEABLE

158. The crypto-revolution has purported to be retail investor friendly. Major crypto-exchanges, including Binance U.S., are at the forefront of promoting crypto-assets as easy to access, safe, and favorable for the common investor. The underlying theme is that, unlike traditional institutions, crypto-exchanges care about and take care of their customers.

159. The reality is very different from the narrative. Major crypto-exchanges routinely impose harsh, unconscionable terms on investors that include draconian purported limitations on liability, class action waivers, one-sided arbitration provisions intended to deprive investors of their

day in court, and multi-step informal dispute resolution procedures so convoluted and time-consuming that they discourage the filing of claims in the first place.

160.    In April 2022, mere months ago, this Court in *Bielski v. Coinbase, Inc.*, invalidated one such unconscionable arbitration scheme imposed by another crypto-exchange, Coinbase, Inc. The arbitration scheme there lacked mutuality:  Coinbase's scheme imposed an unfair, burdensome "informal complaint process" only on customers and "no obligation on Coinbase itself to submit its disputes with users to binding arbitration," meaning Coinbase could file claims in court, while its customers had to arbitrate their claims.  2022 WL 1062049 at *4 (N.D. Cal. Apr. 8, 2022).  With respect to the informal complaint process, this Court observed:

> Coinbase's tripartite complaint process requires users to jump through multiple, antecedent hoops before initiating arbitration . . . [t]here is no legitimate commercial need for this many burdensome obstacles prior to arbitrating disputes relating to a basic user agreement for services like those provided by Coinbase.

*Id.* at *5.

161.    The terms Binance U.S. imposes on its customers, including Plaintiff, are equally unfair and unconscionable.  The Binance U.S. Terms of Use in effect as of January 4, 2022 (and in effect as of the time Plaintiff executed his UST trades) imposed a similar multi-part complaint process that required customers to jump through several, antecedent hoops before initiating arbitration and reserved to Binance U.S. the ability to file in Court should it so choose.  That arbitration scheme was unenforceable by any measure.

162.    Rather than looking to the *Bielski* decision as the impetus to fix its process, or to the recent UST/LUNA catastrophe as a chance to help investors, Binance U.S. unilaterally amended its arbitration scheme on June 1, 2022, to make it even more punitive and further discourage customers from obtaining relief.

163.    As written, the version of Binance U.S.'s Terms of Use as of June 1, 2022 (the "June 1 Terms"), requires Binance U.S. customers to arbitrate all disputes with Binance U.S. in accordance with the rules of the American Arbitration Association (the "AAA").  Those same Terms of Use leave Binance U.S. free to litigate disputes with its customers in any forum it so desires.  This lack

44

of mutuality, among other reasons, renders any obligation to delegate so-called gateway disputes about the scope of arbitrability to an arbitrator unconscionable and unenforceable (to the extent such an obligation exists—the June 1 Terms are silent about delegation but Plaintiff, without conceding that the AAA rules require delegation, assumes Defendants will argue that they do so). It follows that the entire arbitration agreement, including a dependent purported class action waiver, is unconscionable too.[9]

164. At the outset, any purported delegation requirement is procedurally unconscionable. There is no express warning in the Terms of Use that the doors to the courts are closed with respect to gateway disputes about arbitrability. Instead, a customer like Plaintiff must intuit any delegation obligation from the bare reference to the "AAA rules"—but even that reference is not decisive, as there are hundreds of active and archived versions of AAA rules available on the AAA's website that apply to different types of disputes and may or may not require delegation.[10] And if a customer, after combing through the various versions of the AAA rules, is able to determine which version applies and whether it contains a delegation provision, his or her only option is to accept delegation or refuse to deal with Binance U.S., as agreements with Binance U.S. are classic contracts of adhesion presented to customers (including Plaintiff) on a take-it-or-leave it basis without any opportunity for negotiation. Exacerbating the unfairness, Binance U.S. reserves to itself the unilateral ability to "amend or modify" the Terms, including with respect to arbitrability.

165. Any purported delegation requirement is also substantively unconscionable because it is confusing and lop-sided, and lacks mutuality.

166. In order to reach arbitration, including with respect to gateway arbitrability issues, customers like Plaintiff must jump through hoops by going through a lengthy pre-arbitration

---

[9] Plaintiff does not seek to set forth all of his arguments regarding arbitration here, but rather sets forth facts sufficient to explain why he believes this case belongs in court, instead of in arbitration. Plaintiff focuses on the June 1, 2022 Terms of Service because he anticipates that Defendants will argue that they control.

[10] https://www.adr.org/active-rules (listing over 50 active AAA rules that apply to different types of disputes); https://www.adr.org/ArchiveRules (listing archived rules).

complaint submission procedure (the "Submitting A Complaint Procedure"), which is described in a thick block of text as follows:

> **Submitting A Complaint**. If you have a complaint, you must first open a ticket with Customer Service and work with Customer Service to resolve your issue. Once you have already done so, and Customer Service has been unable to resolve your issue, please email your complaint to resolution@binance.us. In that email, you must provide your Customer Service ticket number, state the cause of your complaint, how you would like us to resolve the complaint, and any other information you believe to be relevant. Without a Customer Service ticket, your complaint email will be deemed premature and will not receive a response. Upon receiving your complaint, we will open a support ticket and a user complaints officer ("**Complaint Officer**") will review your complaint. The Complaint Officer will review your complaint without prejudice, based on the information you provided and any information we may derive from our records. Within thirty business days ((all days excluding Saturday, Sundays, and any bank holiday in the State of California) ("**Business Days**")) of our receipt of your complaint, the Complaint Officer will use reasonable efforts to address the points raised in your complaint and the Complaint Officer may: (1) offer to resolve your complaint in the way you have requested; (2) reject your complaint and set out the reasons for the rejection; or (3) offer to resolve your complaint with an alternative proposal or solution. In exceptional circumstances, if the Complaint Officer is unable to respond to your complaint within thirty Business Days, the Complaint Officer will use reasonable efforts to send you a holding response indicating the reasons for a delay in answering your complaint and specifying the deadline by which the Complaint Officer will respond to your complaint.

167. Distilled, to complete the Submitting A Complaint Procedure, the customer must first "open a ticket with Customer Service" (the Terms of Use are silent on how) and "work with Customer Service to resolve [the] issue." If no resolution is reached, then the customer must email Binance U.S. and provide detailed information about his or her complaint, which triggers a complaint review period. There is no outer time limit constraining the review period. At a minimum, it will last 30 *business days* (typically, approximately 45 days). But even then, Binance U.S. may seek to indefinitely extend the "deadline" to "respond" to the Complaint if it is unable to respond within 30 business days.

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

168.   The odyssey does not then end, as Binance U.S. imposes another, separate hurdle before an arbitration can be initiated (the "Notice Procedure").  Pursuant to the Notice Procedure, the customer must submit to Binance U.S., in hardcopy, a notice "(1) describe[ing] the nature and basis of the claim or dispute; and (2) sett[ing] forth the specific relief sought."  The Notice Procedure further requires the parties to engage in a separate, informal resolution process for at least 30 days after receipt of the notice before commencing arbitration.

169.   It is only after completing the Submitting A Complaint Procedure and the separate Notice Procedure that the customer may initiate the arbitration.  But unlike Binance U.S., *it is only the customer who must complete the Submitting A Complaint Procedure; who is bound to any mandatory delegation obligation (and, more broadly, any arbitration agreement); and who waives any right to proceed in court or have a jury trial*.  Specifically, the Terms provide that:

> If **we cannot resolve your dispute through the complaint process** (See **Submitting A Complaint**), **you agree that any dispute or controversy** arising out of or relating to these Terms or the [Binance U.S.] Services . . . **shall be resolved through binding arbitration on an individual basis** (except as specifically noted below). Arbitration shall be conducted in accordance with the rules of the [AAA].  In agreeing to this binding commitment to arbitrate **your claims, you agree that you waive any right to proceed in a court of law or to have your claims heard by a jury.**

170.   The lone exception to "individual" arbitration is consolidation of multiple arbitration proceedings—a consolidation procedure Binance U.S. added to its June 1 update to the Terms that is *unavailable to customers, but that Binance U.S. may invoke in its sole discretion.*

> [I]n the event that **your claim**(s) in an arbitration substantially implicate or relate to the rights of, or claims by, other [Binance U.S.] customers who have also initiated arbitration against [Binance U.S.], **you agree that [Binance U.S.] shall have the right, but not the obligation, to join or consolidate such arbitrations into a single arbitration, in [Binance' U.S.s] sole discretion.**

171.   Meanwhile, Binance U.S. need only complete the Notice Procedure (with its shorter time horizon) before it commences an arbitration.  But, while the failure of a *customer* to

47

successfully resolve a dispute through the Submitting A Complaint Procedure triggers a mandatory obligation to arbitrate for the customer, the failure of *Binance U.S.* to resolve a dispute through the Notice Procedure triggers *no* such mandatory obligation for Binance U.S.  On this issue, the Terms provide:  "We [Binance] agree to use good faith efforts to resolve the claim directly, but if we do not reach an agreement to do so within 30 days after the Notice is received, **you or [Binance U.S.] may commence an arbitration proceeding**."  Accordingly, unlike its customers, *Binance U.S. may commence actions in court and need not engage in any informal dispute resolution process before doing so*.  Of course, Binance U.S. derives numerous benefits from this one-sided arrangement, such as the choice of its preferred forum, including broader or narrower discovery at its option; a guaranteed preview of customer claims; and the ability to file claims immediately without risking the passage of any looming statute of limitations.

172.  And Binance U.S. stripped further rights from the June 1 Terms.  Previously, Binance U.S. agreed to pay the arbitration fee for small claims (those less than $10,000) in apparent recognition that the prospect of paying a filing fee alone can discourage claims. Under the June 1 Terms, Binance U.S. forces all claimants to pay their own fees, regardless of the amount in dispute—a tactic designed to discourage mom and pop retail investors from pursuing claims. The timing of that revision also coincides with the aftermath of the events giving rise to this very dispute—the collapse of UST—which as discussed below, operates in conjunction with the purported class action waiver as part of Binance U.S.'s scheme to effectively prevent consumers from bringing claims for small losses.

173.  At the time of the filling of this action, however, resolution@binance.us was not a working email address, making it impossible to even begin the process necessary to pursue relief:

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC



174. This underscores that the arbitration scheme here is unfair and unreasonable.

175. Further, on September 7, 2022, in apparent response to the original Complaint in this action, Binance U.S. modified its Terms of Use (the "September 7 Terms") to attempt to cure several of the infirmities that were identified in the original Complaint in this action, including those above. The September 7 Terms do not govern this dispute, because they expressly provide that they "will not apply retroactively." Nonetheless, they shed light on and confirm the unconscionability of the June 1 Terms.

176. *First*, the following clause of the June 1 Terms (1) lacked mutuality, (2) made the complaint process mandatory, and (3) failed to specify the governing AAA rules:

> If **we cannot resolve your dispute through the complaint process** (See **Submitting A Complaint**), **you agree that any dispute or controversy** arising out of or relating to these Terms or the [Binance U.S.] Services . . . **shall be resolved through binding arbitration on an individual basis** (except as specifically noted below). Arbitration shall be conducted in accordance with the rules of the [AAA. In agreeing to this binding commitment to arbitrate **your claims, you agree that you waive any right to proceed in a court of law or to have your claims heard by a jury.**

177. The language of this clause in the September 7 Terms was revised to (1) establish mutuality where it did not exist before, (2) not make the complaint procedure a mandatory prerequisite to arbitration, and (3) specify the applicable version of the AAA rules:

> **BAM and you** agree that any dispute or controversy arising out of or relating to these Terms or the [Binance U.S.] Services . . . shall be resolved through binding arbitration on an individual basis (except as specifically noted below). Arbitration shall be conducted in accordance with the rules of the American Arbitration Association ("AAA"), **Consumer Arbitration Rules**. In agreeing to this binding commitment to arbitrate **their** claims, **BAM and you** agree that they waive any right to proceed in a court of law or to have **their** claims heard by a jury.

178. *Second*, with respect to the "Submitting a Complaint" procedure, the June 1 Terms provided the following mandatory language: "**Submitting A Complaint**. If you have a complaint, you **must** first open a ticket with Customer Service and work with Customer Service to resolve your issue." That language was revised in the September 7 Terms to be permissive: "**Submitting A Complaint.** If you have a complaint, you **may** first open a ticket with Customer Service and work with Customer Service to resolve your issue."

179. *Third*, as discussed above, the June 1 Terms do not contain a delegation clause. Accordingly, the following language was added to the September 7 Terms: "Delegation. Any dispute between BAM and You regarding the construction, interpretation, or application of this arbitration provision, including the enforceability, severability, revocability, scope, or validity of this arbitration provision, shall be decided by an arbitrator and not by a court or judge."

180. Binance U.S.'s Terms also include a purported class action waiver, but that clause is unenforceable under the applicable common law because it is procedurally and substantively unconscionable.

181. The provision is procedurally unconscionable because Binance U.S. presents its Terms on a "take it or leave it" basis. Binance U.S. does not negotiate the Terms with its customers. Binance U.S. and its prospective customers do not have remotely equal bargaining power.

182. The provision is substantively unconscionable because, tethered to the arbitration provision discussed above, it effectively precludes Binance U.S. customers from bringing their claims, which is a harsh and oppressive result, including because it would be economically challenging or even cost-prohibitive for many Binance U.S. customers to bring a claim.

183. On information and belief, many Class members suffered losses of less than $10,000 from Binance U.S.'s unlawful sale of UST, such that it would be cost-prohibitive for them to bring individual claims against Binance U.S. Recognizing this, following the crash of UST, Binance U.S. revised its arbitration clause to no longer pay the arbitration fee for small claims (those less than $10,000), since the prospect of paying a filing fee alone would discourage claims. And making clear that its revisions were in response to a concrete event with widespread effect on its customers—the collapse of UST—Binance U.S. inserted a non-mutual batch arbitration clause to further advantage it vis-a-vis customers in any looming mass filing of arbitral proceedings.

184. Binance U.S. makes its class action waiver even further substantively unconscionable by coupling it with a limitation of liability clause, which in its June 1 Terms purports to limit its liability to its customers to $10,000.

185. One-sided, exculpatory contracts in a contracts of adhesion, to the extent they operate to insulate a party from liability that otherwise would be imposed under California law, are unconscionable. And when there is a purported class action waiver in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when the party with the superior bargaining power has allegedly carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then the waiver becomes in practice the exemption of the party from its wrongful conduct and is unconscionable.

186. The Binance U.S. Terms themselves, and the other factual allegations contained herein, compel the reasonable inference that, having imposed on customers a contract of adhesion through its Terms, Binance U.S. has carried out a scheme to deliberately cheat large numbers of customers out of individually small sums of money.

187.    Binance U.S. understood, for example, that many customers following the crash of UST would not suffer sizeable losses and therefore would face cost-prohibitive individual arbitrations or lawsuits.  Accordingly, it amended its terms to ensure that those customers facing less than $10,000 in losses in the UST crash would incur arbitration fees that they would not have under Binance U.S.'s prior Terms, in order to prevent their filing arbitrations to pursue their claims. Coupled with its purported class action waiver, Binance U.S. effectively implemented a scheme to prevent purchasers of small amounts of UST from seeking relief, after it had solicited and effectuated those purchases.  And coupled with a purported limitation on liability of $10,000, which Plaintiff does not concede is enforceable, Binance U.S. effectively seeks to insulate itself from *any* liability for its wrongful conduct.

188.    Accordingly, just as with Coinbase's arbitration scheme, the scheme here, encompassing both Binance's pre-dispute resolution, arbitration, and purported class action waiver provisions, is unconscionable and unenforceable, which permits Plaintiff to file his claims in this Court on a class-wide basis.

## **CLASS ALLEGATIONS**

189.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

190.    Plaintiff seeks class certification on behalf of a nationwide class defined to include all persons or entities who transacted in UST on Binance U.S. during the Class Period.

191.    Plaintiff reserves the right to modify or refine the definitions of the Class based upon discovery of new information and to accommodate any manageability of the Court's concerns.

192.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; Defendants and any Defendant's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as any Defendant's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclasses; (d) persons whose claims in this matter have been finally

adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

193.    **Ascertainability**.  The proposed Class is readily ascertainable because it is defined using objective criteria so as to allow Class members to determine if they are part of a Class. Further, the Class can be readily identified through records maintained by Defendants.

194.    **Numerosity (Rule 23(a)(1))**.  The Class is so numerous that joinder of individual members herein is impracticable.  The exact number of members of the Class, as herein identified and described, is not known, upon information and belief there are thousands of purchasers, if not more, who transacted UST on Binance U.S.

195.    **Commonality (Rule 23(a)(2))**.  Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

- whether Binance U.S. offered UST for sale;

- whether Binance U.S. offered UST for sale that constitute securities under the federal securities laws;

- whether Binance U.S. knew or should have known that UST it listed for trading were securities;

- whether Binance U.S. operated as a securities exchange as defined by the federal securities laws;

- whether Binance U.S. operated as a broker-dealer as defined by the federal securities laws;

- whether Binance U.S. violated the federal securities laws;

- whether Plaintiff and the members of the Class are entitled to damages and the amount and measure thereof; and

196.    **Typicality (Rule 23(a)(3))**.  Plaintiff's claims are typical of the claims of the other members of the proposed Class.  Plaintiff and members of the Class suffered injuries as a result of Binance U.S.'s wrongful conduct that is uniform across the Class.

197.    **Adequacy (Rule 23(a)(4))**.  Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel competent and experienced in complex litigation and class actions.  Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.  Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class.

198.    **Substantial Benefits**.  This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

199.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

200.    Plaintiff reserves the right to revise these class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Offer and Sale of Unregistered Securities

54

**Sections 5 and 12(a)(1) of the Securities Act**
**(Against Binance U.S.)**

201.    Plaintiff realleges the allegations above.

202.    Plaintiff brings this claim within three years of the first *bona fide* public offering of UST.

203.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."  15 U.S.C. § 77e(a).

204.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

205.    UST is, and at all relevant times has been, a security within the meaning of Section 12(a)(1) of the Securities Act.  *Id.* § 77b(a)(1).  No registration statements have been filed with the SEC or have been in effect with respect to UST listed on Binance U.S.

206.    Throughout the Class Period, Binance U.S. promoted, solicited, offered, and sold 12(a)(1) securities—UST—to Plaintiff and members of the Class.  Customers on Binance U.S. transact with Binance U.S. itself, and Binance U.S. is thus a seller of UST.

207.    In addition, by offering UST to Plaintiff and members of the Class, Binance U.S. solicited these purchases, and in doing so was motivated at least in part by a desire to serve its own

financial interests or the financial interests of UST holders. Binance U.S. received a direct financial benefit, in the form of transaction fees, from each purchase of UST on its exchange. Binance U.S. further benefitted from purchases of UST on its exchange because such purchases supported a liquid trading market for UST, which in turn makes Binance U.S.'s exchange more attractive to investors and issuers. Binance U.S. thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell unregistered securities, or to carry or cause such unregistered securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

208. Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

209. Accordingly, Binance U.S violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1).

210. Plaintiff and Class members who during the Class Period purchased UST on Binance U.S. and subsequently sold that UST at a loss seek damages, inclusive of transaction fees. *See id.* § 77*l*(a)(1). Plaintiff and Class members hereby offer to tender to Binance U.S. the UST or substantial equivalent realized upon sale of all UST they purchased on Binance U.S. and later sold at a loss. In exchange for such tender, Plaintiff and the Class are entitled to recover the amount of consideration they paid to purchase the tendered UST.

## SECOND CAUSE OF ACTION

**Offer and Sale of Unregistered Securities**
**Control Person Liability for Violations of the Securities Act**
**Section 15 of the Securities Act**
**(Against Shroder)**

211. Plaintiff realleges the allegations above.

212. This claim is asserted against Shroder for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

213. Section 15 of the Securities Act provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *Id.* § 77o(a).

214. As CEO of Binance U.S., Shroder had the power and authority to direct the management and activities of Binance U.S. and its employees, and to cause Binance U.S. to engage in the wrongful conduct complained of herein. Shroder, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Binance U.S.

215. Shroder purposefully exercised his power and influence to cause Binance U.S. to violate the Securities Act as described herein, including by directing Binance U.S. not to register as an exchange or broker-dealer prior to offering and selling securities to Plaintiff and members of the Class in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77l(a)(1). Binance U.S. is liable under section 12(a)(1) of the Securities Act, *id.* § 77l(a)(1), for its violations of the Securities Act.

216. At the time of the wrongs alleged herein, Shroder had sufficient influence to cause Binance U.S. to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act. Shroder purposefully decided not to do so.

217. Shroder knowingly and culpably participated in, and/or aided and abetted, Binance U.S.'s violations of the Securities Act alleged herein. Shroder had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Binance U.S.'s liability under Section 12(a)(1) of the Securities Act.

218.     Accordingly, Shroder is jointly and severally liable for the violations of the Securities Act by Binance U.S. complained of herein and is liable to Plaintiff and the Class for damages, inclusive of transaction fees, as to each transaction in which any UST purchased in the Class Period was subsequently sold at a loss.  See *id.* § 77l(a)(1).

## THIRD CAUSE OF ACTION

**Contracts to Pay Transaction Fees to an Unregistered Exchange**
**Sections 5 and 29(b) of the Exchange Act**
**(Against Binance U.S.)**

219.     Plaintiff realleges the allegations above.

220.     In relevant part, Section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of … any means or instrumentality of interstate commerce for the purpose  of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e.  An "exchange" is any entity that "constitute[s], maintain[s], or provide[s] 'a market place or facilities for bringing together purchasers and sellers of securities.'" 17 C.F.R. § 240.3b-16 (quoting 15 U.S.C. § 78c).

221.     Throughout the Class Period, Binance U.S. has made use of means and instrumentalities of interstate commerce for the purpose of using facilities of an exchange within and subject to the jurisdiction of the United States to effect transactions in UST.  Binance U.S. has operated its exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

222.     Binance U.S. is an exchange because it provides a marketplace and facilities for bringing together purchasers and sellers of UST.  All UST are, and at all relevant times were, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

223.     Binance U.S. and its exchange have never been registered as national securities exchange under 15 U.S.C. § 78f, nor are they exempt from such registration. *See id.* § 78e.

224.     Binance U.S. has thus operated an unregistered exchange in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e, throughout the Class Period.

225.     Each transaction in UST on Binance U.S. constitutes a contract between Binance U.S. and Plaintiff or a Class member.   Pursuant to these contracts, Plaintiff and Class members paid Binance U.S. transaction fees to fulfill purchase orders for UST.

226.     The foregoing contracts were made in violation of Section 5 of the Exchange Act. The performance of these contracts necessarily involves the violation of Section 5 because, pursuant to each such contract, Binance U.S. was required to continue its practice of operating unregistered exchanges that bring together purchasers and sellers of UST.

227.     Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . .  shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).

228.     Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void and rescind the contracts pursuant to which they paid Binance U.S. fees for fulfillment of purchase orders for UST and to recover, as a rescissory remedy, the fees they have paid under those contracts.

**FOURTH CAUSE OF ACTION**

**Contracts to Pay Transaction Fees**
**to an Unregistered Broker or Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(Against Binance U.S.)**

229.     Plaintiff realleges the allegations above.

230.     Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in,

or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

231. A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A).

232. Binance U.S. has operated as a broker during the Class Period by facilitating the sale of UST in exchange for compensation primarily in the form of transaction fees, including by marketing UST, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with the issuer to transfer UST to investors after payment. All UST are, and at all relevant times were, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1).

233. A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business." *Id.* § 78c(a)(5).

234. Binance U.S. has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' UST, by providing customers with access to services allowing purchase of UST on credit, by having a regular turnover inventory of securities, by purchasing UST for accounts in Binance U.S.'s own name (often at a discount), and by selling UST from its inventory to investors for profit.

235. Throughout the Class Period, Binance U.S. has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, UST.

236. Binance U.S. has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

237. Binance U.S. has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

238.    In the course of operating as an unregistered broker-dealer, Binance U.S. has entered into contracts with Plaintiff and Class members pursuant to which Plaintiff and Class members paid Binance U.S. transaction fees to fulfill purchase orders for UST.

239.    The foregoing contracts were made in violation of Section 15(a)(1) of the Exchange Act.  The performance of these contracts necessarily involves the violation of section 15(a)(1) because, pursuant to each such contract, Binance U.S. was required to continue its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer.

240.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange)  . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).

241.    Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void and rescind the contracts pursuant to which they paid Binance U.S. fees for fulfillment of purchase orders for UST and to recover, as a rescissory remedy, the fees they have paid under those contracts.

## FIFTH CAUSE OF ACTION

**Contracts to Purchase Securities
from an Unregistered Exchange
Sections 5 and 29(b) of the Exchange Act
(Against Binance U.S.)**

242.    Plaintiff realleges the allegations above.

243.    In relevant part, Section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security … unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such

registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitute[s], maintain[s], or provide[s] 'a market place or facilities for bringing together purchasers and sellers of securities.'" 17 C.F.R. § 240.3b-16 (quoting 15 U.S.C. § 78c).

244. Throughout the Class Period, Binance U.S. has made use of means and instrumentalities of interstate commerce for the purpose of using facilities of an exchange within and subject to the jurisdiction of the United States to effect transactions in UST. Binance U.S. has operated an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

245. Binance U.S. is an exchange because it provides a marketplace and facilities for bringing together purchasers and sellers of UST. All UST are, and at all relevant times were, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

246. Binance U.S. has never been registered as a national securities exchange under 15 U.S.C. § 78f, nor is it exempt from such registration. *See id.* § 78e.

247. Binance U.S. has thus operated an unregistered exchange in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e, throughout the Class Period.

248. Each transaction in UST on Binance U.S. constitutes a contract between Binance U.S. and a Plaintiff or Class member. Binance U.S. induced Plaintiff and Class members to enter these contracts for the purchase of UST during the Class Period. Binance U.S. did so by promoting, soliciting, offering, and selling UST to Plaintiff and members of the Class. In seeking to induce Plaintiff and members of the Class to purchase UST, Binance U.S. was motivated at least in part by a desire to serve its own financial interests or the financial interests of owners of UST for sale on Binance U.S. Binance U.S. received a direct financial benefit, in the form of transaction fees, from each purchase of UST on Binance U.S. Binance U.S. further benefits from purchases of UST on Binance U.S. because such purchases support a liquid trading market for UST, which in turn makes Binance U.S. more attractive to investors and issuers.

249. The contracts that Binance U.S. induced Plaintiff and Class members to enter for the purchase of UST were made in violation of Section 5 of the Exchange Act, 15 U.S.C. § 78e. The

performance of these contracts necessarily involves the violation of Section 5 because each such contract could not be performed unless Binance U.S. continued its practice of operating an unregistered exchange that brings together purchasers and sellers of UST.

250. Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of any such contract." *Id.* § 78cc(b).

251. Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void and rescind each contract pursuant to which they purchased, on Binance U.S., any UST that they later sold at a loss.

## SIXTH CAUSE OF ACTION

### Illegal Contracts to Purchase Securities from an Unregistered Broker or Dealer Sections 15(a)(1) and 29(b) of the Exchange Act (Against Binance U.S.)

252. Plaintiff realleges the allegations above.

253. Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

254. A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A).

255. Binance U.S. has operated as a broker during the Class Period by facilitating the sale of UST in exchange for compensation primarily in the form of transaction fees, including by marketing UST, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer UST to

investors after payment. All UST are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1).

256. A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." *Id.* § 78c(a)(5).

257. Binance U.S. has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' UST, by providing customers with access to services allowing purchase of UST on credit, by having a regular turnover inventory of securities, by purchasing UST for accounts in Binance U.S.'s own name (often at a discount), and by selling UST from its inventory to investors for profit.

258. Throughout the Class Period, Binance U.S. has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, UST.

259. Binance U.S. has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

260. Binance U.S. has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

261. Each transaction in UST on Binance U.S. constitutes a contract between Binance U.S. and a Plaintiff or Class member. Binance U.S. induced Plaintiff and Class members to enter contracts for the purchase UST during the Class Period. Binance U.S. did so by promoting, soliciting, offering, and selling UST to Plaintiff and members of the Class. In seeking to induce Plaintiff and members of the Class to purchase UST, Binance U.S. was motivated at least in part by a desire to serve its own financial interests or the financial interests of owners of UST for sale on Binance U.S. Binance U.S. received a direct financial benefit, in the form of transaction fees, from each purchase of UST on Binance U.S. Binance U.S. further benefits from purchases of UST on

Binance U.S. because such purchases support a liquid trading market for UST, which in turn makes the Binance U.S. more attractive to investors and issuers.

262. The contracts that Binance U.S. induced Plaintiff and Class members to enter for the purchase of UST were made in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1). The performance of these contracts necessarily involves the violation of section 15(a)(1) because each such contract could not be performed unless Binance U.S. continued its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer. Furthermore, Binance U.S. violated Section 15(a)(1) by inducing Plaintiff and Class members to enter these contracts—and thus engage in the business of effecting transactions in securities for the account of others, the business of buying and selling securities for Binance U.S.'s own account, or both—without being registered as a broker or dealer.

263. Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." 15 U.S.C. § 78cc.

264. Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void and rescind each contract pursuant to which they purchased on Binance U.S. any UST that they later sold at a loss.

## SEVENTH CAUSE OF ACTION

### Control Person Liability for Violations of the Exchange Act
### Section 20 of the Exchange Act
### (Against Shroder)

265. Plaintiff realleges the allegations above.

266. This claim is asserted against Shroder for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

267. Section 20(a) of the Exchange Act provides: "Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

268. At the time of the wrongs alleged herein, because Shroder is the CEO Binance U.S., Shroder had the power and authority to direct the management and activities of Binance U.S. and its employees, and to cause it to engage in the wrongful conduct complained of herein. Shroder, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Binance U.S. Shroder purposefully exercised his power and influence to cause Binance U.S. to violate the Exchange Act as described herein, including by (1) operating unregistered exchanges and, in the course of operating such exchanges, entering unlawful contracts to sell UST and to receive transaction fees for sales of UST, in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e; and (2) operating as an unregistered broker-dealer, and, in the course of so operating, entering unlawful contracts to sell UST and to receive transaction fees for sales of UST, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

269. At the time of the wrongs alleged herein, Shroder had sufficient influence to cause Binance U.S. either to register as an exchange and broker-dealer or to refrain from acts that are prohibited by the Exchange Act for persons not registered as an exchange and broker-dealer. Shroder purposefully decided not to do so.

270. Shroder knowingly and culpably participated in, and/or aided and abetted, Binance U.S.'s violations of the Exchange Act alleged herein. Accordingly, Shroder is jointly and severally liable for the violations of the Exchange Act by Binance U.S. complained of herein and is liable to Plaintiff and the Class for rescission and/or damages as to all transactions in which Plaintiff and Class members purchased, on Binance U.S., any UST that they later sold at a loss.

**EIGHTH CAUSE OF ACTION**

**Offer or Sale of Unqualified Securities**
**Cal. Corp. Code §§ 25110, 25130, and 25503**
**(Against Binance U.S.)**

271.     Plaintiff realleges the allegations above.

272.     This claim is brought on behalf of Plaintiff and Class members who bought or sold UST on Binance U.S. California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities.  Cal Corp. Code §§ 25110, 25130.  Any person who offers or sells a security in violation of section 25110 or 25130 is "liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned.  Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

273.     A security includes, *inter alia*, "investment contract[s]" and derivative instruments (such as "call[s]" and "option[s]"). *Id.* § 25019.

274.     UST is, and at all relevant times has been, securities within the meaning of the California Securities Act. *Id.* § 25019.  UST was neither qualified under the California Securities Act nor exempt from qualification. *Id.* §§ 25110, 25130.

275.     During the Class Period, Binance U.S. offered or sold UST to Plaintiff and Class members through its operations in California.  Customers on Binance U.S. transact solely with Binance U.S. itself, and Binance U.S. is thus a seller of UST.

276.     Moreover, in offering UST to Plaintiff and members of the Class in California, Binance U.S. solicited these purchases, and in doing so was motivated at least in part by a desire to serve its own financial interests or the financial interests of owners of UST for sale on Binance U.S.

Binance U.S. received a direct financial benefit, in the form of transaction fees, from each purchase of UST on Binance U.S. Binance U.S. further benefits from purchases of UST because such purchases support a liquid trading market for UST, which in turn makes Binance U.S. more attractive to investors and issuers.

277.     Throughout the Class Period, Binance U.S. directed the foregoing actions to California, including without limitation through solicitations directed by Binance U.S. to users in California and received by users in California.

278.     Accordingly, Binance U.S. has violated the California Securities Act through its sale of unqualified securities.

279.     Plaintiff and members of the Class who purchased UST on Binance U.S. and subsequently sold those UST at a loss seek damages, inclusive of transaction fees, as to each transaction in which any UST was purchased during the Class Period and was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

## NINTH CAUSE OF ACTION

### Sale of Securities by an Unregistered Broker-Dealer
### Cal. Corp. Code §§ 2521 and 25501.5(a)
### (Against Binance U.S.)

280.     Plaintiff realleges the allegations above.

281.     This claim is brought on behalf of Plaintiff and Class members who bought or sold UST on Binance U.S.

282.     The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law.  Cal. Corp. Code § 25210.

283.     A "broker-dealer" includes "any person engaged in the business of effecting transactions in securities in [California] for the account of others or for that person's own account" and any "person engaged in the regular business of issuing or guaranteeing options with regard to securities not of that person's own issue." *Id.* § = 25044.  A security includes, *inter alia*, "investment contract[s]" and derivative instruments (such as "call[s]" and "option[s]"). *Id.* § 25019.

68

284.    Binance U.S. has operated as a broker-dealer in California during the Class Period. Binance U.S. has engaged in the business of effecting transactions in securities for the account of others by facilitating the sale of UST in exchange for compensation primarily in the form of transaction fees, including by marketing UST, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer UST to investors after payment.  Binance U.S. has engaged in the business of effecting transactions in securities for their own account by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' UST, by providing customers with access to services allowing purchase of UST on credit, by having a regular turnover inventory of securities, by purchasing UST for accounts in their own name (often at a discount), and by selling UST from their inventory to investors for profit.  All UST are, and at all relevant times have been, securities as defined by California law.  Throughout the Class Period, Binance U.S. directed the foregoing actions to California, including without limitation through solicitations directed by Binance U.S. to users in California and received by users in California.

285.    Binance U.S. has never registered or applied for registration as a broker-dealer under California law.  Binance U.S. does not qualify for any exemption from registration of broker-dealers under California law.

286.    Binance U.S. has thus operated as an unregistered broker-dealer in violation of Cal. Corp. Code § 25210.

287.    In the course of operating as an unregistered broker-dealer, Binance U.S. has sold UST to members of the Class. Binance U.S. solicited members of the Class to purchase UST, and in doing so, was motivated at least in part by a desire to serve its own financial interests or the financial interests of owners of UST for sale on Binance U.S.  Binance U.S. received a direct financial benefit, in the form of transaction fees, from each purchase of UST on Binance U.S. Binance U.S. further benefit from purchases of UST because such purchases support a liquid trading market for UST, which in turn makes Binance U.S. more attractive to investors and issuers.

288.   Under California law, any person who offers or sells a security in violation of Cal. Corp. Code § 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages.  *Id.* § 25501.5(a)(1).  A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser.  *Id.* § 25501.5(a)(4).

289.   Accordingly, Binance U.S. has violated Cal. Corp. Code §§ 25210 and 25501.5(a).

290.   Plaintiff and members of the Class who purchased UST on Binance U.S. and subsequently sold those UST at a loss seek damages, inclusive of transaction fees, as to each transaction in which any UST purchased in the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

### TENTH CAUSE OF ACTION

**Control Person Liability for Violations of the California Securities Act**
**Cal. Corp. Code § 25504**
**(Against Shroder)**

291.   Plaintiff realleges the allegations above.

292.   This claim is brought on behalf of Plaintiff and Class members who bought or sold UST on Binance U.S.

293.   Every person who directly or indirectly controls a person liable under the California Securities Act for unlawfully selling unqualified securities is "liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."  Cal. Corp. Code § 25504.

294.   At the time of the wrongs alleged herein, Shroder controlled Binance U.S.  As CEO, Shroder was a principal executive officer of Binance U.S.

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

295.     Shroder knew of Binance U.S.'s violations of Cal. Corp. Code §§ 25110 and 25130 because he was aware both of Binance U.S.'s lack of appropriate registration and the fact that Binance U.S. was selling UST.

296.     Accordingly, as a "principal executive officer" of a liable corporation who had knowledge of the facts by which liability is alleged to exist, Shroder is jointly and severally liable for the violations of Cal. Corp. Code §§ 25110 and 25130 by Binance U.S. complained of herein and is liable to Plaintiff and the Class for damages, inclusive of transaction fees, as to each transaction in which any UST was purchased during the Class Period and was subsequently sold at a loss. *See id.* § 25503.

## PRAYER FOR RELIEF

297.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as to each and every count, including:

- An order certifying this action and the Class requested herein as a class action, designating Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel to the Class;

- An order declaring that Defendants' actions, as set forth above, constitute violations of the federal and state laws set forth above and that Defendants are liable to Plaintiff and the Class, as described herein, for damages arising therefrom;

- A judgment awarding Plaintiff and the Class all appropriate damages, in an amount to be determined at trial;

- A judgment awarding equitable relief, as may be appropriate including, but not limited to, rescission, restitution, and disgorgement;

- A judgment awarding Plaintiff and the Class prejudgment and post-judgment interest to the maximum extent permitted by law;

- A judgment awarding Plaintiff and the Class costs and fees, including attorneys' fees to the maximum extent permitted by; and

- Grant such other legal, equitable or further relief as the Court may deem just and proper.

AMENDED CLASS ACTION COMPLAINT - No. 3:22-cv-03461-JSC

## DEMAND FOR JURY TRIAL

298.  Plaintiff demands a trial by jury for all issues so triable.

Dated:        October 19, 2022

                                    Respectfully submitted,

                                    */s/ Edward Normand*
                                    Velvel (Devin) Freedman (*pro hac vice forthcoming*)
                                    Edward Normand (*pro hac vice*)
                                    Joseph Delich (*pro hac vice*)
                                    Alex Potter (*pro hac vice*)
                                    Ivy T. Ngo (SBN 249860)
                                    **FREEDMAN NORMAND FRIEDLAND LLP**
                                    99 Park Avenue, 1910
                                    New York, NY 10016
                                    Tel.: (646) 350-0527
                                    vel@rochefreedman.com
                                    tnormand@rochefreedman.com
                                    jdelich@rochefreedman.com
                                    apotter@rochefreedman.com
                                    ingo@rochefreedman.com

                                    *Counsel for Lead Plaintiff and the Class*