Velvel (Devin) Freedman (*pro hac vice*)
Edward Normand (*pro hac vice*)
Joseph Delich (*pro hac vice*)
Alex Potter (*pro hac vice*)
Ivy T. Ngo (SBN 249860)
**FREEDMAN NORMAND FRIEDLAND LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
Tel.: (646) 350-0527
vel@fnf.law
tnormand@fnf.law
jdelich@fnf.law
apotter@fnf.law
ingo@fnf.law

*Counsel for Lead Plaintiff Michiel Nuveen
and the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BAM Trading Services Inc. Securities Litigation | Case No.: 3:22-cv-03461-JSC<br><br>**LEAD PLAINTIFF MICHIEL NUVEEN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL**<br><br>Judge: Hon. Jacqueline Scott Corley<br>Ctrm.: 8<br>Date: February 2, 2023<br>Time: 10:00 a.m. |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 1

ARGUMENT....................................................................................................................... 7

I.      Defendants Have Not Met Their Burden to Show an Agreement to Arbitrate ..................... 7

II.     The Parties Did Not Delegate the Issue of Arbitrability to the Arbitrator ........................... 10

        A.       Defendants Have Not Shown Clear and Unmistakable Evidence of an Agreement to Delegate Arbitrability to the Arbitrator ............................... 11

        B.       Any Delegation Under the AAA Consumer Arbitration Rules Is Unenforceable .... 13

                1.      Any Delegation Is Procedurally Unconscionable ......................................... 13

                2.      Any Delegation Is Substantively Unconscionable.......................................... 15

III.    The Arbitration Clause Is Unenforceable.................................................................... 19

IV.    The Dispute Falls Outside the Scope of the Arbitration Clause....................................... 20

V.     The Court Should Not Sever Any Unenforceable Provisions ........................................... 21

VI.    Shroder Cannot Invoke the Delegation or Arbitration Clause ........................................ 23

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Juniper Networks, Inc.*,
  115 Cal. App. 4th 638 (2004) ............................................................................. 16

*Ajamian v. CantorCO2e, L.P.*,
  203 Cal. App. 4th 771 (2012) ............................................................................. 15

*Amisil Holdings Ltd. v. Clarium Capital Mgmt. LLC*,
  622 F. Supp. 2d 825 (N.D. Cal. 2007) ............................................................... 25

*Armendariz v. Found Health Psychare Servs., Inc.*,
  24 Cal. 4th 83 (2000) ....................................................................... 13, 16, 22, 23

*Baltazar v. Forever 21, Inc.*,
  62 Cal. 4th 1237 (2016) ..................................................................................... 16

*Berman v. Freedom Fin. Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ............................................................................ 7, 9

*Bielski v. Coinbase, Inc.*,
  2022 WL 1062049 (N.D. Cal. Apr. 8, 2022) ........................................ 14, 15, 17, 18

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) ........................................................................... 10

*Britton v. Co-op Banking Grp.*,
  4 F.3d 742 (9th Cir. 1993) ................................................................................. 25

*Carbajal v. CWPSC*,
  245 Cal. App. 4th 227 (2016) ............................................................................. 20

*Castaldi v. Signature Retail Servs., Inc.*,
  2016 WL 74640 (N.D. Cal. 2016) ...................................................................... 23

*Comb v. PayPal, Inc.*,
  218 F. Supp. 2d 1164 (N.D. Cal. 2002) .............................................................. 19

*Contratto v. Ethicon, Inc.*,
  227 F.R.D. 304, 308 (N.D. Cal. 2005) ................................................................. 9

*Cooley v. LCS Santa Rosa, LLC*,
  2021 WL 4490116 (Cal. Ct. App. Oct. 1, 2021) ................................................... 8

*Corcoran v. CVS Pharmacy, Inc.*,
  2021 WL 633809 (N.D. Cal. Feb. 18, 2021) ....................................................... 13

*Davis v. TWC Dealer Grp., Inc.*,
  41 Cal. App. 5th 662 (2019) .............................................................................. 16

*Esgeurra-Aguilar, Inc. v. Shapes Franchising, LLC,*
  2020 WL 3869186 (N.D. Cal. July 9, 2020)...................................................................24

*Fabian v. Renovate Am., Inc.,*
  42 Cal. App. 5th 1062 (2019) .........................................................................................8

*Fisher v. MoneyGram Int'l,*
  66 Cal. App. 5th 1084 (2021) ..................................................................................14, 15

*Gatton v. T-Mobile USA, Inc,*
  152 Cal. App. 4th 571 (2007) ........................................................................................14

*Greenberg v. Amazon.com, Inc.,*
  2021 WL 7448530 (N.D. Cal. May 7, 2021) ...................................................................8

*In re Pac. Fertility Ctr. Litig.,*
  814 F. App'x 206 (9th Cir. 2020) ..................................................................................24

*In re Zoom Video Commc'ns Priv. Litig.,*
  525 F. Supp. 3d 1017 (N.D. Cal. 2021) ..........................................................................8

*Ingalls v. Spotify USA, Inc,*
  2016 WL 6679561 (N.D. Cal. Nov. 14, 2016) ..................................................11, 12, 13

*Kramer v. Toyota Motor Corp.,*
  705 F.3d 1122 (9th Cir. 2013) .......................................................................................24

*Long v. Provide Com., Inc.,*
  245 Cal. App. 4th 855 (2016) ..........................................................................................7

*MacClelland v. Cellco P'Ship,*
  2022 WL 2390997 (N.D. Cal. July 1, 2022)..............................................................11, 12

*Macias v. Excel Bldg. Servs. LLC,*
  767 F. Supp. 2d 1002 (N.D. Cal. 2011) ........................................................................21

*Magill v. Wells Fargo Bank, N.A.,*
  2021 WL 6199649 (N.D. Cal. June 25, 2021) ...............................................................11

*Mami Nutraceuticals, LLC v. Nat'l Merchant Ctr., Inc.,*
  2017 WL 3081823 (C.D. Cal. 2017) ..............................................................................14

*Mcunu v. Trader Vic's,*
  2020 WL 12894939 (N.D. Cal. May 20, 2020) ..............................................................16

*Meadows v. Dickey's Barbecue Rests. Inc.,*
  144 F. Supp. 3d 1069 (N.D. Cal. 2015) ........................................................................12

*Millner v. Bock Evans Fin. Counsel, Ltd.,*
  114 F. Supp. 3d 871 (N.D. Cal. 2015) ..........................................................................20

*Murphy v. DirecTV, Inc.*,
  724 F.3d 1218 (9th Cir. 2013) ..................................................................................... 23

*Namisnak v. Uber Techs., Inc.*,
  315 F. Supp. 3d 1124 (N.D. Cal. 2018) ......................................................................... 7

*Newstyle Cap. Inv. Mgmt. (Hong Kong) Ltd. v. Mobile Gaming Techs., Inc*,
  2021 WL 2176857 (Cal. Ct. App. May 28, 2021) ................................................. 21, 25

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ....................................................................................... 8

*Nitsch v. DreamWorks Animations SKG Inc.*,
  100 F. Supp. 3d 851 (N.D. Cal. 2015) ......................................................................... 24

*Norcia v. Samsung Telecommc'ns Am., LLC*,
  2014 WL 4652332 (N.D. Cal. Sept. 18, 2014), *aff'd*, 845 F.3d 1279 (9th Cir. 2017) .................. 7

*Perez v. DirecTV Grp. Holdings, LLC*,
  251 F. Supp. 3d 1328 (C.D. Cal. 2017) ....................................................................... 13

*Pokorny v. Quixtar, Inc.*,
  601 F.3d 987 (9th Cir. 2010) ....................................................................................... 15

*Poublon v. C.H. Robinson Co.*,
  846 F.3d 1251 (9th Cir. 2017) ............................................................................... 16, 23

*Ruiz v. Moss Bros. Auto Grp.*,
  232 Cal. App. 4th 836 (2014) ....................................................................................... 8

*Shahtout v. Cal. Psychare, Inc.*,
  562 F. Supp. 3d 913 (C.D. Cal. 2022) ............................................................. 13, 19, 20

*Shroyer v. New Cingular Wireless Servs., Inc.*,
  498 F.3d 976 (9th Cir. 2007) ....................................................................................... 14

*Smith v. Miller Brewing Co. Health Benefits Program*,
  860 F. Supp. 855 (M.D. Ga. 1994) ............................................................................... 17

*Tompkins v. 23andMe, Inc.*,
  2014 WL 2903752 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016) ............ 11, 12

*Vargas v. Delivery Outsourcing, LLC*,
  2016 WL 946112 (N.D. Cal. Mar. 14, 2016) ........................................................... 13, 15

*Wang v. Life Ins. Co. of the Southwest*,
  2019 WL 13201949 (N.D. Cal. Dec. 19, 2019) .............................................................. 9

*Wilson v. Huuuge, Inc.*,
  351 F. Supp. 3d 1308 (W.D. Wash. 2018), *aff'd*, 944 F.3d 1212 (9th Cir. 2019) .................. 9

iv

*Wilson v. Huuuge, Inc.*,
  944 F.3d 1212 (9th Cir. 2019) ...................................................................................................8, 9

OPPOSITION TO MOTION TO COMPEL ARBITRATION | 3:22-CV-03461-JSC

Lead Plaintiff Michiel Nuveen respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration and Dismiss or Stay Proceedings.

## PRELIMINARY STATEMENT

This action concerns one of the most important events in the history of crypto-assets: the collapse of the algorithmic stablecoin UST and the tens of billions of dollars in wealth and consumer savings that the collapse wiped out. At the direction of Defendant Brian Shroder, BAM Trading Services Inc. ("Binance") sold to investors UST—an unregistered security—through Binance's unregistered securities exchange in violation of the securities laws, resulting in losses. Defendants now seek to escape facing in this Court claims arising from that misconduct, by moving to compel arbitration. The Court should reject Defendants' misguided attempt. *First*, by offering only the scantest evidence that Plaintiff ever saw, or agreed, to terms containing an arbitration clause, Defendants fail to carry their burden to show the existence of an agreement. *Second*, Defendants cannot show clear and unmistakable evidence of an agreement to delegate the issue of arbitrability to an arbitrator, and if they could, such a delegation is unenforceable here. *Third*, the arbitration clause that Binance contends binds Plaintiff is unenforceable as an unconscionable non-mutual clause contained in a contract of adhesion with an oppressive complaint process. *Fourth*, Plaintiff's statutory securities claims fall outside of the scope of the arbitration clause. *Fifth*, the arbitration clause cannot be saved through severing its unconscionable provisions. And *sixth*, the Court should reject Shroder's attempt, as a nonsignatory, to force Plaintiff's claims against him into arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

Binance is a crypto-asset exchange that operates a platform on which customers discover, research, buy, and sell crypto-assets. "UST" was an asset that Binance listed between April 13 and June 19, 2022. Dkt. No. 36 ("AC") ¶¶ 1-2. UST is an "algorithmic stablecoin" created and centrally controlled by Terraform Labs ("TFL"), a Singapore crypto-asset company run by its founder and CEO Kwon Do-hyung ("Do Kwon"). *Id.* ¶ 3. The value of UST depends on and is derivative of the value of "LUNA," another crypto-asset developed and centrally controlled by TFL. *Id.*

UST and LUNA are securities. *Id.* ¶ 12. Retail investors were drawn to purchase UST by two primary promises of passive and "risk-free" profits on their investment. *First*, TFL promised

1

that investors would be able to "extract risk-free profit" from arbitrage opportunities between the price of LUNA and UST. *Id.* ¶ 105. *Second*, UST investors were promised they could earn nearly 20% interest on their holdings by passively "staking" UST on a "savings" platform developed and maintained by TFL called the "Anchor Protocol," such that prior to its crash, nearly 72% of all UST was deposited on the Anchor Protocol. *Id.* ¶¶ 62, 107. Despite their status as such, neither UST nor LUNA are registered as securities with the SEC or state regulators. And despite providing trading of UST, Binance is not registered with the SEC or state regulators as a securities exchange.

UST was advertised, including by Binance's parent company, as "safe," "stable," and "fiat-backed." *Id.* ¶¶ 4-6, 9. But it was none of those things. In May 2022, in the span of just a few days, UST lost essentially all its approximately $18 billion in market value when, as Treasury Secretary Yellen testified to Congress, it "experienced a run and declined in value," illustrating the "risks to financial stability" that the crypto-asset market could entail. *Id.* ¶ 87. The crash of UST crushed retail investors like Binance's customers. *Id.* ¶¶ 83-86. It also created a domino effect that wiped off billions of dollars from the crypto-asset market. *Id.* ¶ 87. Accordingly, Interpol issued a "Red Notice" in September 2022 for Do Kwon's extradition stemming from the crash of UST. *Id.* ¶ 10. Assessing the "devastating losses" incurred by retail investors, the *New York Times* pointed to "irresponsible behavior of the institutions backing Mr. Kwon." *Id.* ¶ 84. Binance is one of those institutions. *Id.* Indeed, Binance did not even stop selling UST until *after* this action was filed on June 13, 2022. *Id.* ¶ 10; Dkt. No. 1. And even after the collapse of LUNA and UST, Binance's parent company began selling Luna 2.0, a new token controlled by TFL. *Id.* ¶ 10.

Defendant Shroder is the Chief Executive Officer of Binance. *Id.* ¶ 18. At all relevant times, Shroder had the power and authority to direct the management, policies, and employees of Binance. *Id.* ¶¶ 214, 268. Shroder used this power to cause Binance to violate the securities laws by, among other things, directing Binance not to register as an exchange or broker-dealer prior to (1) selling and offering securities and (2) entering into unlawful contracts to sell UST and receive transaction fees for such sales. *Id.* ¶¶ 215, 268. Shroder had the ability to ensure that Binance refrained from promoting, soliciting, offering, or selling unregistered securities, or else registered as an exchange or broker-dealer. *Id.* ¶¶ 216, 269. But he purposefully decided not to do so. *Id.* Indeed, Shroder

knowingly participated in, or aided and abetted, Binance's violation of the securities laws. *Id.* ¶¶ 217, 270, 295.

On September 19, 2022, Plaintiff Michiel Nuveen was appointed Lead Plaintiff in this action and Freedman Normand Friedland LLP (f/k/a Roche Freedman LLP) was appointed Lead Counsel. Dkt. No. 35. Plaintiff began using Binance to purchase crypto-assets in December 2020. Nuveen Decl. ¶ 2. He does not recall seeing or agreeing to any Terms in connection with beginning to use Binance—whether in December 2020 or ever. *Id.* ¶ 3. Plaintiff purchased UST on Binance beginning on April 29, 2022, with his final transaction of UST on Binance on May 18, 2022. Dkt. No. 28-3. On October 19, 2022, Plaintiff filed the operative Amended Complaint. Dkt. No. 36.

Defendants now move to compel arbitration because they claim (at 3, *citing* Dkt. No. 40-1 ¶ 3) that "during the time period" Binance sold UST from April through May 2022, "all users, as a condition of using the BAM platform, expressly agreed" to the Terms of Use that were effective as of January 4, 2022 (unless otherwise specified, the "Terms"). Yet Defendants also cryptically claim (at 15), without any further explanation, that "Plaintiff agreed to the Terms" not during *that* time period, but "*when he set up his BAM account*" (emphasis added). And Defendants contend (at 3 n.2) that Plaintiff is *not* bound by its revision of its Terms on June 1, 2022, "because they are not retroactive and not the terms that Plaintiff agreed to if he purchased UST." But Defendants ignore that the June Terms were "effective as of the time they are posted" and that as to the arbitration clause, it would not be "retroactive" to apply the version that was in effect at the time of filing, which was the provision contained in the June Terms.[1] In short, Defendants do not explain how Plaintiff came to "expressly agree" to the January Terms and how those, rather than the June Terms, govern the issue of *arbitrability* of this action. In addition, the Court need not decide whether the January Terms or the June 2022 Terms apply here—Defendants have not met their burden to show the existence of an agreement to *either* set of Terms, and the purported delegation clause and the arbitration scheme

---

[1] The June Terms, which Defendants do not attach, provide: "The Revised Terms shall be effective as of the time they are posted, but will not apply retroactively." Normand Decl. Ex. 1, at 1.

OPPOSITION TO MOTION TO COMPEL ARBITRATION | 3:22-CV-03461-JSC

contained in *both* sets of Terms are unenforceable. Plaintiff focuses here on the January Terms that form the basis for Defendants' motion.

**The January Terms** provide a "tripartite" dispute-resolution structure consisting of (1) the "Complaint" procedure, (2) the "Notice" procedure, and (3) the "Arbitration" procedure.

At the first step, the customer must file a complaint with Binance. *See* Dkt. No. 40-2 at 12. The Complaint provision is non-mutual and intended only for the *customer*, not Binance: "If *you* have a complaint, please state the cause of your complaint, how you would like us to resolve the complaint, and any other information you believe to be relevant, in the manner described on our Support page." *Id* (emphasis added).[2] The Complaint procedure could take 30 business days (typically, approximately 45 days), but could take longer if the Complaint Officer cannot resolve the complaint with 30 business days. *Id.* The procedure does not specify the number of days the Complaint Officer can take to resolve a complaint; rather it gives them discretion to "specify[] the deadline by which the Complaint Officer will respond to [the customer's] complaint." *Id.*

After waiting weeks if not months to go through the Complaint procedure, the customer is still not free to arbitrate. Instead, the customer must now go through the Notice procedure, which requires (1) mailed notice with specified content and (2) that Binance use good faith efforts to resolve the claim within 30 days of the notice before either party may commence arbitration. Dkt. No. 40-2 at 14. In contrast to the customer, Binance need only complete the Notice procedure (with its shorter time horizon) before it commences any arbitration. For the customer, the Arbitration procedure is conditioned on the completion of the Complaint procedure and Notice procedure: (1) "*If we*

---

[2] The remainder of the procedure likewise makes clear it binds only customers, not Binance:

> Upon receiving *your* complaint, we will open a support ticket and a user complaints officer ("Complaint Officer") will review your complaint. The Complaint Officer will review *your* complaint without prejudice . . . Within thirty business days . . . of our receipt of *your* complaint, the Complaint Officer will use reasonable efforts to address the points raised in your complaint . . . Any offer of resolution made to *you* will only become binding on BAM if accepted by you.

Dkt. No. 40-2 at 12 (emphasis added).

*cannot resolve your dispute through the complaint process* (See Filing A Complaint), you agree that any dispute or controversy arising out of or relating to these Terms shall be settled through binding arbitration on an individual basis;" and (2) "[*I*]*f we do not reach an agreement to do so within 30 days after the Notice is received*, you or BAM may commence an arbitration proceeding." *Id.* (emphasis added).

There is no delegation clause contained in the January or June Terms. The Arbitration procedure incorporates the AAA rules, but without attaching them or specifying which of the AAA rules are incorporated, or whether the version of the rules that controls is the one in effect at the time the dispute arises or at the time of filing of an arbitration demand: "Arbitration shall be conducted in accordance with the rules of the American Arbitration Association ("AAA"). . . . The AAA rules, as well as instructions on how to file an arbitration proceeding with the AAA, appear at adr.org, or you may call the AAA at 1-800-778-7879." *Id*. In addition, Binance made clear that only customers are bound by the Arbitration procedure, stating "*you agree* that any dispute or controversy arising out of or relating to these Terms shall be settled through binding arbitration on an individual basis." *Id.* (emphasis added)

The January Terms also reserve the right for Binance unilaterally to "amend, supplement, and/or replace these Terms and any terms and conditions incorporated by reference, now or in the future, by posting on the Website or emailing to you the revised terms and conditions, and the revised terms and conditions shall be effective at such time." Dkt. No. 40-2 at 13.

***The June Terms*** are Binance's first revisions following the crash of UST. Like the January Terms, the June Terms require the customer to go through the cumbersome three-step process to get to arbitration. Binance also added the following relevant reaffirmations or additions:

*First*, Binance amended the arbitration scheme to reaffirm that the Complaint process was *mandatory* on customers prior to the initiation of any arbitration: "If you have a complaint, you *must* first open a ticket with Customer Service and work with Customer Service to resolve your issue." Normand Decl. Ex. 1, at 28 (emphasis added). *Second*, Binance amended the arbitration scheme to reaffirm that arbitration was mandatory only for customers, not for Binance: "In agreeing to this binding commitment to arbitrate *your* claims, *you agree* that you waive any right to proceed in a

5

court of law or to have your claims heard by a jury." *Id.* at 29 (emphasis added). *Third*, Binance used its unilateral discretion to amend the Terms to render them even more inequitable and nonmutual. Binance added a consolidation procedure that is unavailable to customers, but that Binance may invoke in its sole discretion: "[I]n the event that your claim(s) in an arbitration substantially implicate or relate to the rights of, or claims by, other [Binance] customers who have also initiated arbitration against [Binance], you agree that [Binance] shall have the right, but not the obligation, to join or consolidate such arbitrations into a single arbitration, in [Binance's] sole discretion." *Id*.

   *The September Terms*, which are the first revisions following the filing of this action, is evidence that Binance recognizes the arbitration scheme contained in its Terms (whether as of January or June) was unenforceable, because it amended several provisions seeking to cure the infirmities raised in the original Complaint. *See* AC ¶¶ 155-88; Dkt. No. 1. Although these are not applicable here—they are "not retroactive" and thus could not apply to this dispute based on (1) transactions entered at the time the January Terms were effective or (2) filing of the action at the time the June Terms were effective—they are relevant to the disputed interpretation of the January Terms addressed further below. Normand Decl. Ex. 2, at 1.

   *First*, in September, Binance amended the Terms to make its Complaint procedure permissive: "If you have a complaint, you *may* first open a ticket with Customer Service and work with Customer Service to resolve your issue." *Id.* at 30. (emphasis added). And unlike the January or June Terms, Binance did not make the Arbitration procedure dependent on finishing the Complaint procedure. *Id.* at 30-31. *Second*, Binance removed the Notice procedure requirement from the Terms. *Compare* Normand Decl. Ex. 2 at 31-32 *with* Normand Decl. Ex. 1 at 29 *and* ECF No. 40-2 at 14. *Third*, Binance made its Arbitration procedure mutual: "*BAM and* you agree that any dispute or controversy arising out of or relating to these Terms or the [Binance] Services . . . shall be resolved through binding arbitration on an individual basis . . . In agreeing to this binding commitment to arbitrate their claims, *BAM and* you agree that they waive any right to proceed in a court of law or to have their claims heard by a jury." Normand Decl. Ex. 2, at 31 (emphasis added). *Fourth,* Binance added a delegation clause to the Terms: "Delegation. Any dispute between BAM and You regarding . . . this arbitration provision, shall be decided by an arbitrator and not by a court or judge."

*Id.* at 31-32. *Fifth*, Binance specified which AAA rules applied: "Arbitration shall be conducted in accordance with the rules of the American Arbitration Association ("AAA"), Consumer Arbitration Rules." *Id.* at 31.

In sum, (1) the January and June Terms required a customer to go through a cumbersome Complaint and Notice procedure that could take weeks (if not months) before allowing a customer to file an arbitration—whereas under the September Terms, a customer could immediately file an arbitration; (2) the January and June Terms required only the customer to arbitrate their claims—whereas the September Terms made the obligation mutual; and (3) neither the January nor the June Terms had a delegation clause, and instead only incorporated unspecified AAA rules—whereas the September Terms contains an express delegation provision and specify which AAA rules apply.

## ARGUMENT

## I.  Defendants Have Not Met Their Burden to Show an Agreement to Arbitrate

Any agreement to arbitrate must be based on the mutual consent of the parties, a "requirement [that] applies with equal force to arbitration provisions contained in contracts purportedly formed over the Internet." *Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 862 (2016). Accordingly, as a threshold matter, the Court must "first determine whether a valid agreement to arbitrate exists." *Norcia v. Samsung Telecommc'ns Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). Seeking to compel arbitration, Defendants bear "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Id*. As "the party opposing arbitration," Plaintiff "receive[s] the benefit of all reasonable doubts and inferences." *Namisnak v. Uber Techs., Inc.*, 315 F. Supp. 3d 1124, 1127 (N.D. Cal. 2018) (citation omitted).

California law, not the Federal Arbitration Act ("FAA"), controls the threshold issue of the existence of an agreement, and "there is no thumb on the scale in favor of finding an arbitration agreement to exist." *Norcia v. Samsung Telecommc'ns Am., LLC*, 2014 WL 4652332, at *4 (N.D. Cal. Sept. 18, 2014), *aff'd*, 845 F.3d 1279 (9th Cir. 2017); *accord Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). As Defendants' own cited authority makes clear, "it is for a *court* to decide whether an arbitration agreement exists *even* where a delegation provision submits

this issue to an arbitrator." *Greenberg v. Amazon.com, Inc.*, 2021 WL 7448530, at *3 (N.D. Cal. May 7, 2021) (emphasis added).

Assent to an electronic agreement can be demonstrated by showing that (i) the consumer "had actual knowledge of the agreement" or (ii) a conspicuous notice that would have put "a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). The *only* evidence of assent that Defendants have submitted *at all* is a declaration that, during the period in which Plaintiff purchased UST on Binance, "all users, as a condition of using the BAM platform, expressly agreed to BAM's applicable 'Terms of Use' that became effective on January 3, 2022." Dkt. No. 40-1 ¶ 3. Defendants submit *no* evidence, for example, that Plaintiff signed (electronically or otherwise) the Terms, or that Binance provided any notice of the Terms to Plaintiff. Courts deny motions to compel arbitration where, "[b]y not providing any specific details about the circumstances surrounding the Contract's execution, [a Declarant] offered little more than a bare statement that [Plaintiff] 'entered into' the Contract without offering any facts to support that assertion." *Fabian v. Renovate Am., Inc.*, 42 Cal. App. 5th 1062, 1070 (2019); *accord Ruiz v. Moss Bros. Auto Grp.*, 232 Cal. App. 4th 836, 844 (2014); *see also In re Zoom Video Commc'ns Priv. Litig.*, 525 F. Supp. 3d 1017, 1041-42 (N.D. Cal. 2021) (holding that Zoom failed to show it had an express contract with plaintiff because its "conclusory paragraph" that "whenever an individual chooses to register for a Zoom account, they are presented with the Terms of Service on their device and asked to click 'Confirm'" lacked "detailed facts and any supporting evidence").[3] And Plaintiff has submitted evidence to the contrary, declaring that he does not

---

[3] The well-established general rule is that "courts will not consider new evidence filed in a reply to a motion." *Cooley v. LCS Santa Rosa, LLC*, 2021 WL 4490116, at *4-5 (Cal. Ct. App. Oct. 1, 2021). That is, the Court should reject any attempt by Defendants to sandbag Plaintiff by submitting additional evidence on reply of either (1) actual knowledge or (2) inquiry notice. "Defendants always had the burden of proving" that they "were entitled to enforce the arbitration agreement," and since they "presented no evidence or argument regarding" actual or inquiry notice of the Terms, then it is "not a proper subject of a reply" and the court should "declin[e] to consider them." *Id.*; *see also Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019) ("Although Huuuge had the burden to present evidence of actual notice, it rolled the dice" by not pursuing discovery and submitting evidence); *Wang v. Life Ins. Co. of the Southwest*, 2019 WL 13201949, at *5 n.3 (N.D. Cal. Dec. 19, 2019) (collecting cases and declining to consider evidence regarding assent to an arbitration agreement submitted for the first time in a supplemental reply); *Contratto v. Ethicon, Inc.*, 227 F.R.D.

8

recall seeing or agreeing to Binance's Terms. Nuveen Decl. ¶ 3. Plaintiff nevertheless addresses in further detail Defendants' failure to show either (1) actual notice and (2) inquiry notice.

*First*, Defendants "had the burden to present evidence of actual notice" in connection with their motion to compel, and as the website operator, Binance "undoubtedly had at least some information probative of actual notice in its control, but it offered nothing on the actual notice issue." *Wilson*, 944 F.3d at 1220 . In fact, "Defendants did not *contend*, in their motion to compel arbitration, that [Plaintiff] had actual knowledge of an agreement to arbitrate." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (emphasis added). Accordingly, "actual knowledge is not at issue" here, since Defendants "do[ ] not present *any* evidence of [Plaintiff's] actual knowledge." *Wilson v. Huuuge, Inc.*, 351 F. Supp. 3d 1308, 1314 (W.D. Wash. 2018) (emphasis added) (argument that a consumer was "likely" to have viewed website terms is "speculation [and] is not enough to prove actual knowledge"), *aff'd*, 944 F.3d 1212 (9th Cir. 2019). In addition, as noted, Plaintiff has submitted evidence contesting that he had any actual knowledge of the Terms. *See* Nuveen Decl.

*Second*, "[u]nless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856. Inquiry notice is a "fact-bound area," and whether "notice is sufficiently conspicuous will turn on the transactional context, the notice's size relative to other text on the site, the notice's proximity to the relevant button or box the user must click to complete the transaction or register for the service, and whether the notice's hyperlinks are readily identifiable" with the court considering "all of these factors together." *Id.* at 868 (Baker, J., concurring). And while fact-bound, certain forms of notice, such as "browserwrap" agreements, are "unenforceable per se." *Id.* (discussing the "four types of internet

---

304, 308 n.5 (N.D. Cal. 2005) (refusing to consider a declaration because "Defendants' attempt to introduce new evidence in connection with their reply papers [was] improper").

contract formation"). Defendants present *no* facts regarding how notice of the Terms was provided to Plaintiff, or even if it was provided at all. Defendants have failed to meet their burden to show an agreement, let alone an agreement to arbitrate or agreement to delegate the issue of arbitrability. The Court should deny their motion to compel on that threshold basis.

## II.    The Parties Did Not Delegate the Issue of Arbitrability to the Arbitrator

If the Court finds there was an agreement to arbitrate (there was not, as shown above), Defendants contend that the Court may not consider the arbitrability of this dispute because the parties purportedly delegated that determination to the arbitrator—even though there is *no* delegation clause contained in the January (or June) Terms at all.[4]

Defendants concede (at 6) that the threshold question of arbitrability is "generally reserved for the court," and that there must be "clear and unmistakable" evidence of delegation, yet the *only* basis on which Defendants argue (at 6) that the parties delegated the question of arbitrability here is "because the arbitration clause incorporates the AAA rules which delegate the question of arbitrability to the arbitrator." Defendants' entire delegation argument is premised on the decision in *Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015), holding that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Id*. at 1130. The Terms provide in relevant part: "Arbitration shall be conducted in accordance with the rules of the American Arbitration Association ('AAA'). . . . The AAA rules, as well as instructions on how to file an arbitration proceeding with the AAA, appear at adr.org, or you may call the AAA at 1-800-778-7879." Dkt. No. 40-2 at 14.

Defendants' reliance on the AAA incorporation clause to find delegation of the issue of arbitrability is misplaced for two fundamental reasons. *First*, the clause in the Terms incorporating the "AAA rules" is not "clear and unmistakable" evidence of delegation here, where the context is a consumer contract of adhesion between a large corporation and an unsophisticated consumer.

---

[4] The evidence is that Binance recognized this infirmity following the filing of the Complaint in this action and thus revised its Terms on September 7, 2022, to state: "Delegation. Any dispute between BAM and You regarding . . . this arbitration provision, shall be decided by an arbitrator and not by a court or judge." Normand Decl. Ex. 2, at 31-32.

*Second*, application of the AAA Consumer Rules delegation clause is unenforceable, as its application here would be both procedurally and substantively unconscionable.

### A. Defendants Have Not Shown Clear and Unmistakable Evidence of an Agreement to Delegate Arbitrability to the Arbitrator

*First*, in *Brennan* the Ninth Circuit excluded from its holding both (1) consumer agreements and (2) agreements between sophisticated and unsophisticated parties, stating that "we need not decide nor do we decide here the effect [if any] of incorporating [AAA] arbitration rules into consumer contracts *or* into contracts of any nature between 'unsophisticated' parties." 796 F.3d at 1131 (alteration in original) (emphasis added); *see, e.g., MacClelland v. Cellco P'Ship*, 2022 WL 2390997, at *3 (N.D. Cal. July 1, 2022) (explaining the Ninth Circuit "expressly left open the question of whether [*Brennan*] applies in the context of unsophisticated parties"). Courts have consistently answered that open question to find *no* delegation by incorporation—"*[e]very* district court decision in our circuit to address the question since *Brennan* has held that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party." *Ingalls v. Spotify USA, Inc*, 2016 WL 6679561, at *3 (N.D. Cal. Nov. 14, 2016) (emphasis added); *accord Magill v. Wells Fargo Bank, N.A.*, 2021 WL 6199649 (N.D. Cal. June 25, 2021) ("Where at least one party is unsophisticated, judges in this district routinely find that the incorporation of the AAA rules is insufficient to establish a clear and unmistakable agreement to arbitrate arbitrability."); *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016) ("[I]ncorporation of the AAA rules does not necessarily amount to 'clear and unmistakable' evidence of delegation, particularly when the party asked to accept the agreement is a consumer.").

Just as fundamental, decisions that have enforced delegation of arbitrability by incorporation of AAA rules where both parties were not corporations were still "in the context of *commercial*, rather than consumer, agreements." *Ingalls*, 2016 WL 6679561, at *4. That is because "[t]o a large corporation (like Oracle) or a sophisticated attorney (like Brennan), it is reasonable to conclude that" incorporation of the AAA rules may evidence delegation, "[b]ut applied to an inexperienced individual, untrained in the law, such a conclusion is likely to be much less reasonable." *Meadows*

11

1  *v. Dickey's Barbecue Rests. Inc.*, 144 F. Supp. 3d 1069, 1078 (N.D. Cal. 2015). As Defendants

2  recognize throughout their brief (at 12-14), including by arguing that the AAA Consumer Arbitra-

3  tion Rules apply here, Binance's Terms are a consumer contract. And while Plaintiff is educated as

4  an orthodontist, he is not a large corporation *or* trained in the law—he is a consumer "far less so-

5  phisticated than" Binance. *Meadows*, 144 F. Supp. 3d at 1078; *see also Ingalls*, 2016 WL 6679561,

6  at *4 (incorporation of AAA rules was not evidence of delegation, given Defendants' "burden,"

7  where plaintiffs were "two consumers—a music teacher and an architect—who have not been

8  shown to have any business or legal acumen").

9      *Second*, Binance quotes the AAA Consumer Arbitration rules to locate its "delegation

10  clause"—but those rules are not referenced in the Terms, which state only that "Arbitration shall be

11  conducted in accordance with the rules of the American Arbitration Association ('AAA')." Dkt.

12  No. 40-2 at 14. And the last sentence provides no more specificity: "The AAA rules, as well as

13  instructions on how to file an arbitration proceeding with the AAA, appear at adr.org, or you may

14  call the AAA at 1-800-778-7879." *Id*. Accordingly, here the "AAA Rules are not quoted or ap-

15  pended to" the Terms, such that "[c]ommon customers" of Binance, like Plaintiff, "should not be

16  expected to understand that the incorporation by reference of the AAA rules—without spelling out

17  the actual provision—would mean that the validity and enforceability of the arbitration provision

18  would be resolved by an arbitrator rather than a court, a result contrary to common expectation."

19  *MacClelland*, 2022 WL 2390997, at *4.

20      *Third*, if the Court were to conclude that the Terms need not be quoted or appended in order

21  to find delegation, the Terms themselves do not even *reference* which of the *dozens* of AAA rules

22  would apply to a customer's dispute. Courts refuse to find delegation where "the arbitration provi-

23  sion contains no express delegation language, and its mention of the 'rules and auspices' of the

24  AAA creates multiple ambiguities about which rules ultimately apply." *Tompkins*, 2014 WL

25  2903752 at *12. Such language (1) "forces a customer to comprehend the import of the" reference

26  to the AAA rules; (2) "locate those rules independently"; (3) decide to consult the Consumer Arbi-

27  tration Rules out of dozens of options; (4) "determine that the AAA's [Consumer] Rules apply by

28  operation of Rule R-1(a)"; and (5) "specifically identify [Rule 14-a] to learn of the delegation

12

OPPOSITION TO MOTION TO COMPEL ARBITRATION | 3:22-CV-03461-JSC

provision." *Id.* Indeed, only after the Complaint in this action was filed did Binance revise its Terms to state: "Arbitration shall be conducted in accordance with the rules of the American Arbitration Association ("AAA"), Consumer Arbitration Rules." Normand Decl. Ex. 2, at 31; *see Corcoran v. CVS Pharmacy, Inc.*, 2021 WL 633809, at *5 (N.D. Cal. Feb. 18, 2021) ("[A]mended contract language is admissible to support competing interpretations of the disputed terms."); *Perez v. DirecTV Grp. Holdings, LLC*, 251 F. Supp. 3d 1328 (C.D. Cal. 2017) (in determining whether to compel arbitration, "a court may consider evidence outside of the pleadings, such as declarations and other documents filed with the court, using a standard similar to the summary judgment standard" (internal citation omitted)).

**B.     Any Delegation Under the AAA Consumer Arbitration Rules Is Unenforceable**

"Even if a delegation of arbitrability is clear and unmistakable it may be found unenforceable if the delegation itself is unconscionable." *Ingalls*, 2016 WL 6679561, at *3. That is, if the Court were to find that Plaintiff unmistakably agreed to be bound by the delegation clause contained in the AAA Consumer Arbitration Rules (Plaintiff did not, as shown above), delegation is unenforceable here because it is both procedurally and substantively unconscionable.

**1.     Any Delegation Is Procedurally Unconscionable**

"Procedural unconscionability focuses on 'oppression or surprise due to unequal bargaining power.'" *Shahtout v. Cal. Psychare, Inc.*, 562 F. Supp. 3d 913, 923 (C.D. Cal. 2022) (quoting *Armendariz v. Found Health Psychare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)). Any delegation clause here is procedurally unconscionable both as a matter of oppression and surprise because it "is part of a contract of adhesion offered to a person with little bargaining power on a take-it-or-leave-it basis, and it" is based on the "incorporate[ion] [of] the AAA rules without attaching them." *Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, at *10 (N.D. Cal. Mar. 14, 2016); *Armendariz*, 24 Cal. 4th at 113 (defining a contract of adhesion as "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject").

*First*, any purported delegation requirement is procedurally unconscionable because it is an oppressive adhesion contract. AC ¶ 164. Binance "drafted and presented the user agreement to

13

[Plaintiff] on a take-it-or-leave-it basis, which deprived him of both the ability to negotiate and meaningful choice." *Bielski v. Coinbase, Inc.*, 2022 WL 1062049, at *6 (N.D. Cal. Apr. 8, 2022). Indeed, the Terms themselves provide that should a customer wish not to abide by a unilateral amendment of the Terms by Binance (presuming they would even know of such an amendment), "your sole and exclusive remedy is to terminate your use of the Services and close your Account(s)." Dkt. No. 40-2 at 13. And Defendants' argument (at 8-9) that Plaintiff may have had alternative sources in the market is of no matter. "[E]vidence that one party has overwhelming bargaining power, drafts the contract, and presents it on a take-it-or-leave-it basis is sufficient to demonstrate procedural unconscionability and require the court to reach the question of substantive unconscion- ability*, even if the other party has market alternatives*." *Fisher v. MoneyGram Int'l*, 66 Cal. App. 5th 1084, 1097 (2021) (emphasis added); *see also Mami Nutraceuticals, LLC v. Nat'l Merchant Ctr., Inc.*, 2017 WL 3081823, at *2-3 (C.D. Cal. 2017) (recognizing a split in California courts with respect to whether an marketplace alternatives bars a finding of procedural unconscionability and finding that the Ninth Circuit has resolved this conflict by holding that "contracts of adhesion es- tablish[] some procedural unconscionability").[5] In addition, courts that have employed the "mean- ingful choice" rationale have done so only "where surprise is not seriously in issue, and the plaintiff relies solely on the defendant's use of an adhesion contract to show procedural unconscionability." *Fisher*, 66 Cal. App. 5th at 1096. In this case, as shown below, the delegation clause is also uncon- scionable because of surprise.

---

[5] Unlike Defendants' suggestion (at 9), an oppressive adhesion contract, presented on a take-it-or- leave-it basis, is procedurally unconscionable outside of the context of employment contracts or contracts for life's necessities. *See, e.g.*, *Fisher*, 66 Cal. App. 5th at 1097 (holding that a consumer need not show lack of market alternatives to show that an agreement for a consumer transaction involving transfer of money using MoneyGram was procedurally unconscionable because it was a contract of adhesion); *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 989-90 (9th Cir. 2007) (rejecting defendant's argument that a consumer needs to establish a lack of market alterna- tives and holding that "a contract may be procedurally unconscionable under California law when the party with substantially greater bargaining power presents a take-it-or-leave-it contract to a cus- tomer – even if the customer has a meaningful choice as to service providers") (internal quotations omitted); *Gatton v. T-Mobile USA, Inc*, 152 Cal. App. 4th 571, 582-83 (2007) (holding with respect to mobile phone services that "a contract of adhesion establishes a minimal degree of procedural unconscionability notwithstanding the availability of market alternatives").

14

OPPOSITION TO MOTION TO COMPEL ARBITRATION | 3:22-CV-03461-JSC

*Second*, with respect to surprise, as Plaintiff alleges, "there is no express warning in the Terms of Use that the doors to the courts are closed with respect to gateway disputes about arbitrability." AC ¶ 164. In *Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010), the court held that the failure to attach the relevant arbitration rules denied plaintiffs "a fair opportunity to review the full nature and extent of the non-binding conciliation and binding arbitration processes to which they would be bound before they signed the [agreements]." *Id.* at 997. Such a failure "multipl[ies] the degree of procedural unconscionability of the" agreements. *Id.*; *see also Vargas*, 2016 WL 946112, at *10. And a plain "reference to AAA rules does not give" someone "much of a clue that she is giving up her usual right to have the court decide whether the arbitration provision is enforceable." *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 790 (2012).

*Third*, "given the level of substantive unconscionability inherent in the delegation clause" discussed below, "the level of procedural unconscionability merits the finding that the delegation clause is unconscionable and, thus, unenforceable." *Coinbase*, 2022 WL 1062049, at *6; *see also Fisher*, 66 Cal. App. 5th at 778 ("California courts employ a sliding scale to determine unconscionability, the more substantive oppressive the contract terms, the less evidence of procedural unconscionability is required to conclude the terms are unenforceable, and vice versa.").

## 2.     Any Delegation Is Substantively Unconscionable

*First*, contrary to Defendants' argument (at 10-11) Plaintiff's arguments *are* directed to the delegation clause, which is substantially intertwined with the arbitration clause itself. As in *Coinbase*, here "the delegation clause only delegates questions of arbitrability that emerge from the user agreement's tripartite dispute-resolution procedure, not arbitration, generally." *Coinbase*, 2022 WL 1062049, at *6. This is also clear from the AAA consumer rules themselves: the "arbitrator shall have the power to rule on his or her own jurisdiction . . . with respect to the existence, scope, or validity of the *arbitration agreement* or to the arbitrability of any claim." (Dkt. No. 40-4, R-14(a).) Accordingly, the "the delegation clause imposes no requirements on" Defendants here, and "lacks the requisite modicum of bilaterality." *Coinbase*, 2022 WL 1062049, at *5.

*Second*, the incorporation of the AAA rules without attaching them heightens the Court's scrutiny of the substantive unconscionability of delegation. Courts "more closely scrutinize the

15

substantive unconscionability" of incorporated terms appearing only in the AAA's rules. *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1262 (9th Cir. 2017). Where the "unconscionability challenge concern[s] some element of the AAA rules of which [Plaintiff] had been unaware when [he] signed the arbitration agreement" such as here with respect to the delegation clause, then "courts will more closely scrutinize the substantive unconscionability of terms that were 'artfully hidden' by the simple expedient of incorporating them by reference rather than including them in or attaching them to the arbitration agreement." *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1246 (2016). That is the case here, where the delegation clause was "artfully hidden" in unattached AAA rules that Plaintiff was unaware of and took him by surprise. Nuveen Decl. ¶ 4.

*Third*, Binance reserves to itself the unilateral ability to "amend or modify" the Terms, including with respect to arbitrability. Indeed, the amendment clause calls out that Binance "may amend, supplement, and/or replace these Terms and *any terms and conditions incorporated by reference*" (Dkt. No. 40-2 at 13) (emphasis added)—thus subjecting the delegation clause contained in the AAA Consumer Arbitration Rules (to the extent incorporated at all) to its reservation of absolute discretion and rendering the delegation clause substantively unconscionable. *See Mcunu v. Trader Vic's*, 2020 WL 12894939, at *10 (N.D. Cal. May 20, 2020) (applying California law to find substantive unconscionability based on a unilateral modification provision); *Davis v. TWC Dealer Grp., Inc.*, 41 Cal. App. 5th 662, 674-75 (2019) (holding that the defendant's "unilateral right to change or modify the agreement at any time, and without notice to the" plaintiff rendered the agreement substantively unconscionable).

*Fourth*, the delegation clause is substantively unconscionable because it lacks mutuality. "[T]he paramount consideration in assessing conscionability is mutuality." *Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 657 (2004). "[A]n arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences." *Armendariz*, 24 Cal. 4th at 120.

The arbitration agreement "in the user agreement imposes no obligation on [Binance] to arbitrate." *Coinbase*, 2022 WL 1062049, at *4. That is clear, because as in *Coinbase*, the arbitration

16

clause ties arbitration to the required completion of its Complaint procedure: "*If we cannot resolve your dispute through the complaint process* (See Filing A Complaint), you agree that any dispute or controversy arising out of or relating to these Terms shall be settled through binding arbitration on an individual basis." Dkt. No. 40-2 at 14 (emphasis added). Defendants argue (at 13-14) that despite this language the delegation clause (and arbitration clause) is mutual, focusing on solely on the language "any dispute or controversy." Defendants are mistaken for at least two reasons.

One, as in *Coinbase*, "[t]he plain language of the informal and formal complaint procedures prior to arbitration only contemplates complaints raised by the consumer, not by" Binance. 2022 WL 1062049, at *4. Binance's "arbitration clause interpretation renders the first clause of the arbitration provision surplusage," *id.*, because it reads "[i]f we cannot resolve your dispute through the complaint process" out of the clause entirely. Two, the subsequent revisions of June reaffirmed that non-mutuality, meaning Binance "changed the language of the [Terms] to make its intent more certain." *Smith v. Miller Brewing Co. Health Benefits Program*, 860 F. Supp. 855, 857 (M.D. Ga. 1994) (noting where "changes in the language that make the intent of the drafter clearer, the court should consider that change in evaluating the disputed term"). And the September 2022 revisions make clear that Binance intended the prior January Terms to bind only customers, not Binance, to arbitration, because they illustrate that Binance knows how to draft a mutual clause. The September Terms state that "*BAM and You* agree that any dispute or controversy . . . shall be resolved through binding arbitration on an individual basis" (Normand Decl. Ex. 2, at 31); by contrast, the January Terms provided that "*you agree that any dispute or controversy* . . . shall be settled through binding arbitration on an individual basis." Dkt. No. 40-2 at 14.

*Fifth,* the delegation clause is substantively unconscionable because of the pre-arbitration complaint procedure itself, which has the effect that "the delegation clause imposes an onerous, unfair burden beyond that of a typical delegation clause, this order finds it substantively unconscionable." *Coinbase*, 2022 WL 1062049, at *6. Binance requires consumers to engage in an "odyssey," AC ¶ 168, such that Binance's "tripartite complaint process requires users to jump through multiple, antecedent hoops before initiating arbitration . . . There is no legitimate commercial need for this many burdensome obstacles prior to arbitrating disputes relating to a basic user agreement

17

for services like those provided by" Binance. *Coinbase*, 2022 WL 1062049, at *5. In contrast, Binance need only complete the Notice procedure (with its shorter time horizon) before it commences an arbitration. While the failure of a customer to successfully resolve a dispute through the Complaint procedure triggers a mandatory obligation to arbitrate, the failure of Binance to resolve a dispute through the Notice procedure triggers no such mandatory obligation for Binance. Accordingly, unlike its customers, Binance may commence actions in court and need not engage in any informal dispute resolution process before doing so. Binance derives numerous benefits from this one-sided arrangement, such as the choice of its preferred forum, including broader or narrower discovery at its option; a guaranteed preview of customer claims; and the ability to file claims immediately without risking the passage of any looming statute of limitations.[6]

Considering the one-sidedness of its Terms, Binance asserts instead (at 12) that a "legitimate business purpose exists for a complaint procedure." Coinbase made the same argument, and like Coinbase, the Binance's "cites, however, analyzed employment contracts. . . In contrast to the more substantial relationship between employee and employer, the [Binance] user agreement governs a less formal, less particularized, consumer relationship." *Coinbase*, 2022 WL 1062049, at *5.

*Sixth*, the delegation clause is further substantively unconscionable because it is silent as to the costs of arbitration. Where an arbitration "clause is silent as to who bears the cost of arbitration,

---

[6] It was impossible to complete the complaint process under the June Terms when this action was filed on June 13, 2022, because the e-mail address provided in the Terms, resolution@binance.us, was not functional. AC ¶ 173. Binance's first retort (at 13 n.4) is that the *January* Terms that were effective when Plaintiff *purchased* UST and that the *September* Terms effective when he filed the *Amended* Complaint did not provide the resolution@binance.us e-mail address for submitting a Complaint. This argument underscores the Kafkaesque maze of shifting procedures and burdens thrown up for Binance's customers—and customers alone—in seeking resolution of their disputes. Binance's second retort is that even an *unreceived* complaint would still start the clock running for Binance to respond, after which a customer could proceed with the rest of the dispute resolution procedure. This argument is disingenuous. "There is no outer time limit constraining the review period" of a Complaint, since "[a]t a minimum, it will last 30 business days (typically, approximately 45 days). But even then, Binance U.S. may seek to indefinitely extend the 'deadline' to 'respond' to the Complaint if it is unable to respond within 30 business days." AC ¶ 167. Those allegations are true—both the January and June Terms provide that a customer can be left waiting longer than 30 business days for a response to a Complaint. *See* Dkt. No. 40-2 at 12; Normand Decl. Ex. 1, at 29.

18

under California law each party is required to pay *pro rata* share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitration, not including counsel fees or witness fees or other expenses incurred by the party for his own benefit." *Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1164 (N.D. Cal. 2002). Accordingly, "under these circumstances" the Court should conclude "that this aspect of the arbitration is so harsh as to be substantively unconscionable." *Id.*

### III.    The Arbitration Clause Is Unenforceable

In the exercise of its jurisdiction, the Court should decline to find this dispute arbitrable both as a matter of (1) lack of any agreement to arbitrate, and (2) unconscionability. *First*, Defendants have not carried their burden to show the existence of any agreement to arbitrate for the reasons discussed in connection with delegation. *See supra* Argument § I. *Second*, as shown both above and below, the Arbitration clause is unconscionable—both procedurally and substantively. *See supra* Argument § II.B.

*Procedural Unconscionability*. The arbitration clause is procedurally unconscionable because it is both oppressive and a product of surprise. It is oppressive because Binance presented it on a take-it-or-leave-it basis, where Binance not only drafted the Terms but has overwhelming bargaining power over its customers. And as it relates to surprise, the Terms neither attach the applicable AAA rules, nor do they specify which rules apply. *See Shahtout v. Cal. Psychare, Inc*., 562 F. Supp. 3d 913, 927-28 (C.D. Cal. 2022) (finding the arbitration agreement procedurally unconscionable defendants failed to "indicate which set of [AAA] rules apply").

Defendants contend, without any legal support, that even if the delegation clause is procedurally unconscionable, the arbitration clause is not as a whole unconscionable because the incorporation of the AAA rules does not render as much "surprise" as in the context of delegation. Defendants are incorrect. Merely incorporating the AAA rules, without specifying which rules apply, which version of the numerous rules apply, or without attaching the applicable rules, renders the arbitration clause procedurally unconscionable. *See Carbajal v. CWPSC*, 245 Cal. App. 4th 227, 244 (2016) ("Numerous cases have held that the failure to provide a copy of the arbitration rules to which the employee would be bound, supported a finding of procedural unconscionability.");

19

*Millner v. Bock Evans Fin. Counsel, Ltd.*, 114 F. Supp. 3d 871, 879 (N.D. Cal. 2015) (finding the arbitration procedurally unconscionable even though the provision provided that the AAA's Commercial Arbitration Rules apply because it "fail[ed] to specify which version of those rules would be utilized").

  *Substantive Unconscionability*. The arbitration clause is substantively unconscionable because it is overly harsh and entirely one-sided. *See Shahtout*, 562 F. Supp. 3d at 923 ("Substantive unconscionability addresses whether a contract yields overly harsh or one-sided results."). The arbitration clause is one-sided in favor of Binance. The arbitration clause requires customers—and only customers—to go through a cumbersome and time-consuming tripartite procedure. *See supra* Factual and Procedural Background; *see also supra* Argument § II.B.b. Moreover, the arbitration clause lacks mutuality—it requires customers to agree to arbitrate their claims against Binance, without requiring the same from Binance. *Id*. And finally, to top it all off, Binance reserves for itself the unilateral ability to "amend or modify" the Terms, thereby ensuring that it can assert more onerous terms against its customers at any time. *Id*. Indeed, Binance already has used its ability to modify the Terms to make it more onerous on its customers. After UST and LUNA's collapse, presumably because Binance was expecting a barrage of lawsuits, Binance modified its Terms to add a consolidation procedure, which is unavailable to its customers, but that Binance may invoke at its sole discretion.

  In addition, if the one-sidedness of Terms were not sufficient to find substantive unconscionability, Binance's Terms are also overly harsh. Due to its silence on the issue of costs, the arbitration clause requires the costs of arbitration to be borne by each party equally. *See supra* Argument § II.B.b. This renders the Terms overly harsh and unconscionable. *Shahtout*, 562 F. Supp. 3d at 924-25 (finding the arbitration agreement's silence with respect to arbitration costs substantively unconscionable due to the default rule that costs will be split among the parties).

## IV. The Dispute Falls Outside the Scope of the Arbitration Clause

  If the arbitration clause were enforceable (it is not, as shown above), this dispute is not within its scope. California law applies in determining the scope of an arbitration provision. *See Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1006 (N.D. Cal. 2011) ("In interpreting the validity

and scope of an arbitration agreement, the courts apply state law principles of contract formation and interpretation."). The January Terms define the scope of the arbitration clause as "any dispute or controversy arising out of or relating to these Terms . . . ." Dkt. No. 42 at 14.

Plaintiff's claims against Binance neither arise out of nor relate to the Terms. In *Newstyle Cap. Inv. Mgmt. (Hong Kong) Ltd. v. Mobile Gaming Techs., Inc*, for example, the plaintiff asserted that defendants violated section 12(a)(1) of the Securities Act of 1933 by participating in the offer and sale of an unregistered security. 2021 WL 2176857, at *2 (Cal. Ct. App. May 28, 2021). One question at issue was whether "the claims against the [defendants] arise out of or relate to the contract containing the arbitration clause." *Id.* at *5. The court found that they did not, because neither "the registration violations under the 1933 Act" nor the "solicitation and offer of an unregistered security" arose from the agreement containing the arbitration clause. *Id.* at *6. Similarly, Plaintiff's counts against Binance alleging a failure to register as an exchange or broker-dealer (Counts III– VI, XI), and related to the solicitation and offer of unregistered securities (Counts I, II, VIII), do not arise out of or relate to the Terms.

In addition, Binance's subsequent amendments to the Terms show that Binance intended the arbitration clause to apply only to claims related to the obligations, rights, or duties under the Terms. Unlike its January Terms, Binance's June and September Terms defined the scope of the arbitration clause to include "any dispute or controversy arising out of or relating to these Terms *or the BAM Services*." *Compare* Dkt No. 40-2 at 14 *with* Normand Decl. Ex. 1, at 29 *and* Normand Decl. Ex. 2, at 31(emphasis added). In each of the Terms, including the January Terms, Binance defined "BAM Services" to include its "Trading Services," which includes sale or purchase of cryptocurrencies. *See* Dkt No. 40-2 at 1, 3-4; Normand Decl. Ex. 1, at 1, 4; Normand Decl. Ex. 2, at 1, 4. Binance's choice to omit "BAM Services" from the scope of the January Terms' arbitration clause shows that Binance did not intend for it to apply to claims stemming from its "Trading Services," such as sale or purchase of cryptocurrencies.

## V.    The Court Should Not Sever Any Unenforceable Provisions

Defendants argue (at 16-17) that this Court should sever the Complaint procedure and enforce the arbitration clause. This argument fails, because the arbitration clause is "tainted with"

21

unconscionability, and therefore it "as a whole cannot be enforced." *Armendariz*, 24 Cal. 4th at 124. In *Armendariz*, the California Supreme Court declined to sever unconscionable provisions of an arbitration agreement for two reasons. *See id.* at 124. One, the arbitration agreement contained *two* unconscionable provisions. Two, the arbitration agreement lacked mutuality and saving the agreement would require the court to "reform the contract . . . by augmenting it with additional terms," which would be improper. *Id.* at 124-25.

The same rationales apply here. As in *Armendariz*, the arbitration provision contains multiple unconscionable provisions. One, the arbitration clause conditions the availability of arbitration on a customer finishing a cumbersome and time-consuming Complaint and Notice procedure. Two, the January Terms give Binance the unilateral ability to modify the Terms, including the arbitration clause, which Binance has already invoked to make the Terms more oppressive to its customers. Three, the Terms lack mutuality—they require only Binance's customers to arbitrate, without requiring Binance to do the same. This is true even if the Complaint procedure is stricken from the Terms. Four, the arbitration clause, due to its silence on the issue, requires each party to pay a pro rata share of expenses and fees, together with other expenses of the arbitration. The sheer number unconscionable provisions shows that the arbitration clause is permeated by unconscionability, and further shows Binance's "systematic effort to impose [an] arbitration on a [customer] not simply as an alternative to litigation, but as an inferior forum that works to [Binance]'s advantage." *Id.* at 124.

In addition, as in *Armendariz*, the arbitration clause lacks mutuality. The arbitration clause provides that "*you agree that* any dispute or controversy . . . shall be settled through binding arbitration on an individual basis." Dkt No. 40-2 at 14. The prefatory clause, "[i]f we cannot resolve your dispute through the complaint process," makes clear that Binance always intended for its customers to arbitrate, while leaving for itself any forum it chooses. *Id.* Contrary to Binance's argument, striking the Complaint procedure, including the prefatory clause referring to the Complaint procedure, will not save the arbitration clause. *See Armendariz*, 24 Cal. 4th at 125 (holding that courts do not the power to reform an agreement by "augmenting it with additional terms").

Defendants' reliance (at 16-17) on *Castaldi v. Signature Retail Servs., Inc.*, 2016 WL 74640 (N.D. Cal. 2016), is misguided. Setting aside that this Court was applying Illinois law and not

1   California law, in *Castaldi*, this Court found that the internal grievance procedure was severable

2   because it could "be eliminated in its entirety without impacting the central purpose of the Agree-

3   ment—mutual arbitration—or requiring any rewriting of the enforceable terms." *Id.* at *14. In that

4   case, unlike here, the central purpose of mutual arbitration was apparent from the arbitration clause

5   itself, which provided that both parties agreed to arbitrate their claims. *Id.* at *2. *Poublon v. C.H.*,

6   846 F. 3d 1251 (9th Cir. 2017), which Defendants also cite (at 16-17), is likewise distinguishable

7   because the arbitration clause in that case, as in *Castaldi* and unlike here, was bilateral. The court

8   severed an unconscionable provision because the provision was "collateral to the main purpose of

9   the contract, which is to require arbitration of disputes." *Id.* at 1273.

10   **VI.   Shroder Cannot Invoke the Delegation or Arbitration Clause**

11        Defendants contend that Shroder, a nonsignatory to the Terms, can nonetheless invoke the

12   arbitration clause under (1) equitable estoppel and (2) agency theories because Plaintiff's claims

13   against Shroder stem from his role as the CEO and control person of Binance. Defendants are mis-

14   taken. Under California law, which governs whether a nonsignatory can invoke an arbitration agree-

15   ment, Shroder cannot invoke the arbitration clause. *See Murphy v. DirecTV, Inc.*, 724 F.3d 1218,

16   1229-32 & n.8 (9th Cir. 2013) (holding that California law applies in determining whether a non-

17   signatory may seek arbitration under the equitable estoppel and the agency theory").

18        *Equitable estoppel*. This "applies in two circumstances: (1) when a signatory must rely on

19   the terms of the written agreement in asserting its claims against the nonsignatory or the claims are

20   intimately founded in and intertwined with the underlying contract, and (2) when the signatory al-

21   leges substantially interdependent and concerted misconduct by the nonsignatory and another sig-

22   natory and the allegations of interdependent misconduct are founded in or intimately connected with

23   the obligations of the underlying agreement." *Id.* at 1229. Under either prong, this theory "requires

24   looking to 'the relationships of persons, wrongs and issues,' with a particular focus on whether the

25   claims the non-signatory seeks to arbitrate are 'intimately founded in and intertwined with the un-

26   derlying contract obligations." *In re Pac. Fertility Ctr. Litig.*, 814 F. App'x 206, 209 (9th Cir. 2020).

27   This requires considering "whether the allegations 'are in any way founded in or bound up with the

28   terms or obligations' in contract." *Id.*

Defendants assert that equitable estoppel applies because Plaintiff alleges interdependent and concerted misconduct by Shroder and Binance,[7] but "allegations of substantially interdependent and concerted misconduct by signatories and nonsignatories, standing alone, are not enough: the allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the underlying agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1133 (9th Cir. 2013). Defendants do not even attempt to argue that the allegations of interdependent misconduct between Shroder and Binance are connected with any obligations under the Terms. Nor can they. Plaintiff's securities law claims against both Shroder and Binance are divorced from any obligations, duties, or rights under the Terms, and Plaintiff's securities law claims are fully viable without reference to the Terms. Accordingly, Shroder cannot invoke the arbitration clause under the equitable estoppel theory. *See Pac. Fertility Ctr.*, 814 F. App'x at 209 ("If the claims 'are fully viable without reference to the terms of [the contract],' equitable estoppel does not apply."); *Nitsch v. DreamWorks Animations SKG Inc.*, 100 F. Supp. 3d 851, 865-68 (N.D. Cal. 2015) (holding that equitable estoppel does not apply because plaintiff does "not seek to enforce or challenge the terms, duties, or obligations" of agreement containing the arbitration clause and because the plaintiff's claims "would be cognizable even if" the plaintiff had not agreed to the agreement).

*Agency*. This doctrine allows "agents of a signatory [to] compel the other signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their capacities as agents (*Letizia*) and (2) the claims against the agents arise out of or relate to the contract containing the arbitration clause (*Britton*) (consistent with the language of the arbitration clause)." *Amisil Holdings Ltd. v. Clarium Capital Mgmt. LLC*, 622 F. Supp. 2d 825, 832 (N.D. Cal. 2007). Assuming Shroder is an agent for Binance and that he is being sued in his capacity as an agent, he still cannot compel arbitration as a nonsignatory under the agency theory, because Plaintiff's allegations regarding Shroder are neither related to any provisions or

---

[7] Defendants' reliance on *Esgeurra-Aguilar, Inc. v. Shapes Franchising, LLC*, 2020 WL 3869186 (N.D. Cal. July 9, 2020), is misguided. The court's holding did not merely rely on the interdependent conduct between the signatories and the non-signatories; rather, the court found that "plaintiffs ha[d] clearly alleged interdependent conducted *related to the Franchise Agreement*," where the arbitration clause was located. *Id*. at *7.

24

interpretations of the Terms, nor does Plaintiff seek to impose contractual liability based on the obligations contained in the Terms. *See Britton v. Co-op Banking Grp.*, 4 F.3d 742, 748 (9th Cir. 1993) (declining to compel arbitration of claims against nonsignatory corporate officers because the officer's alleged wrongdoings were neither related "to any provision or interpretation of the contract" nor did they "impose any contract liability" on the officer). *Newstyle* is particularly instructive. 2021 WL 2176857, at *5. In that case, the plaintiff brought a lawsuit against defendants for securities violations, including certain nonsignatory officers and/or directors who sought to invoke an arbitration provision under an agency theory. *Id.* at *2. The court held that "[e]ven if [defendants] could establish an agency relationship," they could not invoke the arbitration provision because their liability "arises out of their allegedly unlawful solicitation and offer of an unregistered security, and not out of any contractual obligation arising from the . . . [a]greement." *Id.* at *5-6. This Court should hold the same, because Plaintiff's securities claims against Shroder "do not hinge on the validity of the" Terms, nor is Shroder's liability premised on "any contractual obligation arising from" the Terms. *Id.* at *6.

## CONCLUSION

Plaintiff respectfully submits, for all of the foregoing reasons, that the Court should deny Defendants' motion to compel arbitration in its entirety.


Dated: January 4, 2023                    Respectfully Submitted,

                                          **FREEDMAN NORMAND FRIEDLAND LLP**

                                          */s/ Edward Normand*
                                          Velvel (Devin) Freedman (*pro hac vice*)
                                          Edward Normand (*pro hac vice*)
                                          Joseph Delich (*pro hac vice*)
                                          Alex Potter (*pro hac vice*)
                                          Ivy T. Ngo (SBN 249860)
                                          99 Park Avenue, 19th Floor
                                          New York, NY 10016
                                          Tel.: (646) 350-0527
                                          vel@fnf.law
                                          tnormand@fnf.law
                                          jdelich@fnf.law
                                          apotter@fnf.law

ingo@fnf.law

OPPOSITION TO MOTION TO COMPEL ARBITRATION | 3:22-CV-03461-JSC